**CITIZENS UTILITIES COMPANY,**
Petitioner,

v.

**FEDERAL POWER COMMISSION,**
Respondent.

No. 259, Docket 25705.

United States Court of Appeals
Second Circuit.

Argued April 8, 1960.

Decided May 24, 1960.

Milton S. Gould, Gallop, Climenko &
Gould, New York City, Reuben Goldberg,
Washington, D. C., Clifton G. Parker,
Morrisville, Vt., for petitioner.

John C. Mason, Deputy Gen. Counsel,
Federal Power Commission, Washington,
D. C., for respondent (Willard W. Gat-
chell, Gen. Counsel, Howard E. Wahren-
brock, Solicitor, Leonard D. Eesley, As-
sistant General Counsel, Daniel Goldstein
and Joseph B. Hobbs, Attys., Federal

Power Commission, Washington, D. C., on the brief).

Before LUMBARD, Chief Judge, and HAND and HINCKS, Circuit Judges.

HAND, Circuit Judge.

In this case the petitioner, a Delaware corporation, has built hydroelectric dams at several places on the Clyde River, Vermont, which rises in the northeast corner of the state and empties into Lake Memphremagog at Newport, Vermont. Lake Memphremagog itself extends from Newport across the border of Canada and into Canada.

After leaving a small pond, called Spectacle Pond, the Clyde passes through Island Pond, another small sheet of water, whence it meanders for six or seven miles until it is joined by a brook that carries the overflow of two other ponds, Seymour Lake and Echo Pond, at East Charleston. The Clyde continues for about five miles further, passing through Pensioner Pond and thence through Salem Pond until after three miles or so it passes through Clyde Pond and after about two miles more reaches Lake Memphremagog. The petitioner had already built dams at the outlets of Seymour Lake and Echo Pond and also across the river at West Charleston and at Clyde Pond. Another dam above the West Charleston dam had been built at Barton Village which the petitioner does not control. The occasion of this suit is the petitioner's construction of a new project including a "diversion dam," a canal, and a power plant, called Unit No. 11, across the river below the dam at the outlet of Clyde Pond.

In June 1957, the Commission began to investigate this partially completed power project in order to determine whether it was in the public interest to control it in order to preserve the navigation and water supply of the Clyde. In preliminary negotiations the parties stipulated that the petitioner should be free to oppose the jurisdiction of the Commission in spite of a "declaration of intention" made by the petitioner. The Commission held extensive hearings before a presiding examiner who wrote a decision declaring that the Clyde was not "navigable water of the United States" except for the first 4800 feet from its mouth, but that the petitioner's proposed Unit No. 11 and its Newport project affected the interests of interstate or foreign commerce in that part of the stream, and that the Commission therefore had jurisdiction under § 817 of Title 16, U.S.C.A., to grant or refuse a license to maintain both projects. The Commission reversed the examiner and found the whole river navigable, apparently from Spectacle Pond to its mouth, and also that not only Unit No. 11 and the Newport project affected the navigability of the river, but that the petitioner's other projects did so. The petition is to review all parts of the Commission's order.

There can be no doubt that the Clyde Pond dam and Unit No. 11 both have an effect upon the navigability of the river in its last 4800 feet. Indeed, the petitioner does not dispute that the volume of water that reaches the river below the Unit No. 11 changes when the "diversion dam" and the Clyde Pond dam are opened, as they are when hydroelectric generators at Unit 11 and at the Newport project are operated. It was proved that when the dams were opened, the height of the water below the Unit 11 rose eighteen inches and did not assume the level of the Lake until it reached Gardner Park Bridge at a distance of more than half a mile away. There was also evidence that the shutdown of Unit No. 11 made a sixteen foot boat with four passengers and 1800 pounds of freight repeatedly scrape bottom, although when the dam was opened the boat moved without touching. Again, when the power was shut off and the dams were filling, rocks showed above the water in the stream that were covered when the power was put on again. There was a regular correlation between the two, showing changes in total water volume at times of between 12 and 282 cubic feet per second.

**3**

■ The petitioner's dams at West Charleston being about ten miles above the Clyde Pond dam, and those at Seymour Lake and Echo Pond being about twenty miles away, it is, of course, true that the effect of the "diversion dam" at Unit No. 11 and of the Clyde Pond dam upon the navigable part of the river is much more immediate than that of the dams upstream, but the water impounded by the upper dams can in the end escape only through that last mile, and the dams give the petitioner control over the time when it shall arrive. We omit the Barton Village project that does not belong to the petitioner; but Seymour Lake and Echo Pond together impound 4500 "acre feet" of water as against only 1000 "acre feet" impounded by the Clyde Pond dam. It cannot be said that the "effect" of the petitioner's control of so much water tributary to the navigable part of the river is so inconsiderable as to be beyond the scope of § 817; that is to say, that "the interests of interstate or foreign commerce would" (not) "be affected by the construction of a dam" of the kind here at issue. The only question before us is as to the jurisdiction of the Commission, not how far the public interest requires the Commission to regulate their maintenance and use. It must always be remembered that in construing subchapter I of chapter XII of Title 16 U.S.C.A., we are to take into consideration, not alone the condition of a stream as it is, but that "it is proper to consider the feasibility of interstate use after reasonable improvements which might be made." United States v. Appalachian Electric Power Company, 311 U. S. 377, 409, 61 S.Ct. 291, 300, 85 L.Ed. 243. Since there can be no doubt that the last mile of the river is "navigable" without change, the only question is whether the amount of water by which the petitioner can vary its flow affects that part of the river enough to give the Commission jurisdiction over the granting of a license.

■ It is not necessary for us to measure how much such variation will justify actual intervention by the Commission. The "finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive" (§ 825*l*(b)), and it is apparent that the evidence was enough to prove that the petitioner's dams, without change and at the will of the petitioner, are capable of "affecting" temporarily the flow of water in the river below Unit 11, and, indeed, that they do so in the ordinary operation of the petitioner's business. The situation appears to us to be essentially the same as in Georgia Power Company v. Federal Power Commission, 5 Cir., 152 F.2d 908, 913.

Concluding as we do that all the petitioner's dams on the Clyde River do "affect" the navigability of the last mile of that river, it becomes unnecessary for us to decide how much if any of the river above Unit No. 11 is "navigable." That question therefore we leave open.

The order of the Commission requiring an application for license is affirmed on the limited ground stated above.