UNION ELECTRIC COMPANY, Petitioner,

v.

FEDERAL POWER COMMISSION, Respondent.

No. 17142.

United States Court of Appeals Eighth Circuit.

Jan. 13, 1964.

Rehearing Denied Feb. 13, 1964.

Robert J. Keefe, St. Louis, Mo., made argument for petitioner and filed brief with Robert G. McClintock, Keefe, Schlafly, Griesedieck & Ferrell, St. Louis, Mo., and Charles J. Dougherty and Duane A. Patterson, St. Louis, Mo.

Howard E. Wahrenbrock, Sol., F.P.C., Washington, D. C., made argument for respondent and filed brief with Richard A. Solomon, Gen. Counsel, Washington, D. C., Thomas M. Debevoise, Asst. Gen. Counsel, and Joseph B. Hobbs and Josephine H. Klein, Attys., F.P.C., Washington, D. C.

Before JOHNSEN, Chief Judge, MATTHES, Circuit Judge, and GIBSON, District Judge.

GIBSON, District Judge.

Petitioner, Union Electric Company, seeks review of an order of the Federal Power Commission holding that Union Electric's proposed construction of a Hydroelectric Power Plant on the East Fork of the Black River, in Reynolds County, Missouri, would affect the interests of interstate commerce, thus necessitating a license for a project from the Commission, pursuant to the provisions of the Federal Power Act. § 23(b), 16 U.S.C.A. § 817 (Commissioner's "Opinion No. 356" Apr. 19, 1962).

Section 23(b), Part I of the Federal Power Act (16 U.S.C.A. § 817) provides in part as follows:

" * * * Any person, association, corporation, State, or municipality intending to construct a dam or other project works across, along, over, or in any stream or part thereof, other than those defined in this chapter as navigable waters, and over which Congress has jurisdiction under its authority to regulate commerce with foreign nations and among the several States shall before such construction file declaration of such intention with the Commission, whereupon the Commission shall cause immediate investigation of such proposed construction to be made, and if upon investigation it

shall find that the interests of interstate or foreign commerce would be affected by such proposed construction, such person, association, corporation, State, or municipality shall not construct, maintain, or operate such dam or other project works until it shall have applied for and shall have received a license under the provisions of this chapter. If the Commission shall not so find, and if no public lands or reservations are affected, permission is granted to construct such dam or other project works in such stream upon compliance with State laws. June 10, 1920, c. 285, § 23, 41 Stat. 1075; Aug. 26, 1935, c. 687, Title II, § 210, 49 Stat. 846."

Pursuant to § 23(b), the petitioner, Union Electric Company, a corporation, hereinafter referred to as "Union", filed a declaration of its intention to construct, operate, and maintain a "high head pumped-storage electric generating station to be known as its 'Taum Sauk Plant'" to be located on and near the East Fork of the Black River about four miles above the confluence of the East Fork and Black River. The East Fork is non-navigable, but the Black River, into which it flows, is navigable to a limited extent below its confluence with the East Fork and flows into the White River, which in turn empties into the Mississippi. Ties and logs have been floated down the Black River and apparently flat-bottomed boat floats made on these waters.

This project is to be located solely on private lands and the transmission line leading therefrom located on private right-of-way, except where crossing public roads, and no public lands or reservoirs will be occupied or flooded by the project.

The project is located on the East Fork of the Black River in Reynolds County, Missouri, at an elevation of 700 feet above mean sea level, (all references to elevations are above mean sea level) and contemplates a damsite which would impound approximately 6350 acre-feet of water with a free crest spillway at 750 feet and sluice gates at points between 715 and 734 feet. This would be known as the lower pool. The drainage area upstream from the damsite is 88 square miles. An upper reservoir is to be constructed on the top of an adjoining mountain at an elevation of more than 1500 feet. A pressure tunnel and conduit of approximately 6400 feet will connect the upper pool or reservoir with a pumping and generating station to be located on an open channel running to the lower pool, on which will be housed two reversible pump-turbine units, capable of generating 350,000 kilowatts. This would provide an 8-hour generating cycle, while the pump-back operation would take about 11 hours with an average head of about 392,000 kilowatts.

The operation contemplates the use of only 4350 acre-feet of water which will be pumped from the lower to the upper pool during hours when the demand for electricity is low, by the use of the reversible turbines as pumps, with power supplied from other available generating units, and then allowing the water thus stored in the upper pool to flow through the tunnel and open channel, thus operating the turbines by water power for generation of eletricity during periods of peak demands or in emergencies. After passing through the turbines the water will discharge into the open channel to the lower pool, thus completing the cycle of operation. This type of pump-back storage pool operation is in effect a method of storing energy for use at desired times. Union is a public utility under the Federal Power Act and operates both hydroelectric and steam generating plants, selling electricity in parts of Missouri, Illinois, and Iowa over its own transmission lines by which it transmits electric energy in interstate commerce to and from Missouri, Iowa, and Illinois. All of such transmission lines are subject to the jurisdiction of the Federal Power Commission under Part II of the Federal Power Act [§§ 201–209, 16 U.S.C.A. §§ 824–824h] and the transmission line to be constructed from the Taum Sauk project will be interconnected with

the interstate transmission facilities of Union.

The Federal Power Commission, pursuant to § 23(b), Part I of the Federal Power Act, made an investigation of this project, held public hearings, made a finding affirming the Commission's Staff's conclusion "that the construction, operation and maintenance of the proposed project would affect the interest of interstate or foreign commerce" and issued an order that "Union Electric Company is required to obtain a license for its proposed Taum Sauk project works, pursuant to the provisions of the Federal Power Act." The Commission said that "on the basis of the facts stipulated he [the examiner] found that construction of the proposed project would have an inevitable effect upon the navigable capacity of the Black River during periods of high water; and further that the project would have the capability of substantially affecting that navigability at all times" and further found: (Although he did not base his decision on this finding)

"The proposed Taum Sauk Project will be constructed, operated and maintained for the development of power to supply markets not only in Missouri but also in the state of Illinois, thereby affecting the interest of interstate or foreign commerce."

The Commission in its decision adopted both findings as the basis for its order that it was necessary to obtain a license for such project.

By agreement of the parties, construction was commenced and the project is now completed, Union agreeing to apply for a license from the Federal Power Commission if the Order of the Federal Power Commission is sustained by the courts. State and county consent had been obtained for the project. The conditions imposed for a license may be considered quite onerous, although in the public interest, if the interests of interstate commerce is affected.[1]

The petitioner, after filing an application for rehearing, which was denied, petitioned this Court for review of the opinion and order of the Federal Power Commission, pursuant to the provisions of § 313(b) of the Federal Power Act [U.S.C.A., Title 16 § 825*l*(b)] and in its petition not only takes issue on the merits of the findings and order of the Commission but contends that the Commission did not have jurisdiction to issue an order and consequently there is nothing for this Court to review. We shall first consider the jurisdictional issue.

Union contends that aforesaid § 313 (b), Part III of the Federal Power Act, U.S.C.A., Title 16, § 825*l*(b), providing,

1. The Federal Power Act prescribes certain of the terms and conditions to be included in licenses for water power projects. Among the conditions prescribed are the following:

"1. That each license shall be limited to a period of fifty years—Section 6 of Federal Power Act, 16 U.S.C.A. 799;

"2. That after twenty years of operation, surplus earnings 'in excess of a specified reasonable rate of return upon the net investment' of the licensee shall be maintained as a reserve which the Commission may order held until the end of the license period or applied in reduction of net investment—Section 10(d), 16 U.S.C.A. 803(d);

"3. That the licensee shall pay a reasonable annual charge 'in an amount to be fixed by the Commission'—Section 10(e). 16 U.S.C.A. 803(e);

"4. That the United States may acquire the project at or after the end of the license period upon payment of the net investment of the licensee not to exceed the fair value—Section 14, 16 U.S.C.A. 807;

"5. That the accounts and records of the licensee shall be kept in accordance with rules and regulations of the Commission—Section 301 (part III of the Act), 16 U.S.C.A. 825;

"6. That the Commission may fix rates of depreciation and may prescribe what charges are to be treated as depreciation charges—Section 302 (part III), 16 U.S.C.A. 825a;

"7. That the licensee shall file annual and other periodic and special reports—Section 304 (part III), 16 U.S. C.A. 825c."

The statute also authorizes the Commission to require that additional conditions be incorporated in the license—Section 10(g), 16 U.S.C.A. 803(g).

"(b) Any party to a proceeding under this Act aggrieved by an order issued by the Commission in such proceeding may obtain a review of such order in the Circuit Court of Appeals of the United States for any circuit wherein the licensee or public utility to which the order relates is located or has its principal place of business, or in the United States Court of Appeals for the District of Columbia, by filing in such court, within sixty days after the order of the Commission upon the application for rehearing, a written petition praying that the order of the Commission be modified or set aside in whole or in part",

comprehends only a review of an order issued by the Commission and that § 23 (b) of the Federal Power Act does not authorize an order but only a finding contending that the order of the Commission in nature and subject matter is void as beyond the jurisdiction of the Commission.

 Union in its Declaration of Intention asked that the Commission "by order find that the interests of interstate or foreign commerce would not be affected and that public lands or reservations would not be affected by the construction and operation of the proposed project." Also, Union's exceptions to the examiner's report included a proposed order reading:

"IT IS ORDERED that Union * * * shall be permitted to construct, operate and maintain the Taum Sauk Project upon compliance with applicable state laws."

Union's application for administrative rehearing raised no question as to the Commission's jurisdiction or authority to issue an order in this case. The Commission contends, therefore, that such objection cannot be raised in this Court as the provisions of § 313(b) impose a jurisdictional restriction on the power of reviewing courts to review only such matters as shall have been presented to the Commission in an application for re-

hearing. The pertinent part of § 313(b) cited by the Commission reads as follows:

" * * * No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do * * *."

The Commission further contends there is no reasonable ground for failure to raise this objection in the application for rehearing. Without making an exhaustive analysis and comment on the cases cited by the Commission, it has always been regarded as fundamental that jurisdiction over the subject matter cannot be waived by the parties by either action or lack of action. In other words, jurisdiction cannot be conferred where none exists. It, however, is not necessary for this Court to rule upon that contention for the reason that it finds that § 23(b) contemplates the issuance of an order based upon the findings and conclusions of the Commission and that such order is properly reviewable by this Court. Union contends that said § 23(b) contemplates only a finding by the Commission and that the Commission has no jurisdiction to issue an order requiring it to obtain a license. It is true that the Commission cannot make the petitioner obtain a license and construct the project, but it can impose the condition and sanction that if the project is to be constructed a license must be obtained. This is the only logical procedure for a proceeding under this Section. This Section certainly does not intend that resort to the Commission is mandatory to ascertain whether or not a license should be obtained, impose a flat prohibition against unlicensed construction if the Commission finds the project would affect interstate commerce, and at the same time permit this finding to be ignored, construction started by applicant in the face of civil and criminal penalties under §§ 314 and 316 of the Act, and thus place the burden on the Commission to sue in the District Courts for an injunction and allow the

District Court to make a finding *de novo* on this essentially legislative matter. See United States v. Twin City Power Co., 350 U.S. 222, 224, 76 S.Ct. 259, 100 L.Ed. 240. Under Union's theory the burden of going forward after an adverse finding and order to it would be placed on the Commission. This would affect the quantum of proof and the burden of proof would be shifted from Union to the Commission. Here the burden of going forward after an adverse order should properly be upon Union by way of a petition for review of the Commission's findings and order. The only logical and properly expeditious method is for the Commission to issue an order based on its findings and allow a review of that order by the appropriate Court of Appeals. We find that the statute contemplates this type of proceeding.

The Commission also contends that petitioner has possibly waived any objection on the jurisdictional issue and is estopped to contest the Commission's right to take such action, because it requested the issuance of the order made, although not in the form in which it was made. As jurisdiction over subject matter cannot be waived, we find no merit in that estoppel claim. It should be noted that there are civil and criminal penalties provided in §§ 314 and 316 of the Federal Power Act for violation of the prohibition in § 23(b), which facts placed stringent legal consequences to the Commission's determinations in these matters.

The Commission's order or determinations have been judicially reviewed under § 313(b) in the following cases: Citizens Utilities Co. v. F. P. C., 279 F.2d 1 (2d Cir. 1960), cert. denied, 364 U.S. 893, 81 S.Ct. 224, 5 L.Ed.2d 188; Montana Power Co. v. F. P. C., 87 U.S.App.D.C. 316, 185 F.2d 491 (1950), cert. denied, 340 U. S. 947, 71 S.Ct. 532, 95 L.Ed. 683; and Georgia Power Co. v. F. P. C., 152 F.2d 908 (5th Cir. 1946). These cases are all authority for its findings and determinations being "orders", since the parties may not waive the issue of the court's jurisdiction. Houston Natural Gas Corp. v. S. E. C., 100 F.2d 5 (4th Cir. 1938).

The Citizens Utilities case (supra) was heard on petition to review an order of Federal Power Commission determining that the river was navigable and that the project in construction would require an application for license in order to be completed. It was shown that in the regular operation of the project, parts of the navigable stream would be made non-navigable. The Court also states (279 F.2d 1. c. 3):

> "It must always be remembered that in construing subchapter I of Chapter XII of Title 16 U.S.C.A., we are to take into consideration, not alone the condition of the stream as it is, but that 'it is proper to consider the feasibility of interstate use after reasonable improvements which might be made.' United States v. Appalachian Electric Power Company, 311 U.S. 377, 409, 61 S.Ct. 291, 300, 85 L.Ed. 243."

The Montana Power Company v. F. P. C. case also was reviewed by the Court of Appeals for the District of Columbia on a petition to review orders of the Federal Power Commission requiring petitioner to apply for licenses for its nine hydroelectric projects located on navigable water or occupying public lands without proper authority. The Court there in substance upheld the Commission, although the case was affirmed in part and remanded in part.

In the Georgia Power case (supra) the Fifth Circuit on petition reviewed an order of the Federal Power Commission ordering petitioner if it decided to erect a hydroelectric power plant on the Oconee River in Georgia to apply for and accept a license in accordance with the terms of the Federal Power Act. In that case the constitutionality of the Act was attacked as applied to a project located on a non-navigable part of a navigable stream. The Commission's order determined that the navigable capacity of the River below the dam would be affected and at times would render impossible any navigation around the city of Mill-

edgeville, the dam being located 4.3 miles upstream. The Court also held that the Commission's findings were supported by substantial evidence and in such circumstances they would not be disturbed. The Court sustained the Commission's finding that navigable waters were involved in the case and that the operation of the proposed project would affect adversely navigation thereon. The Court overruled the question of constitutionality with respect to petitioner's contention that neither Congress nor the Commission had jurisdiction over non-navigable streams by referring to the cases of United States v. Appalachian Electric Power Co. (supra), Oklahoma v. Atkinson Company, 313 U.S. 508, 61 S.Ct. 1050, 85 L.Ed. 1487 and others.

In all of the above cases it was assumed that the Court of Appeals had jurisdiction to review a determination of the Federal Power Commission that a license should be obtained to construct or to complete a hydroelectric project on either navigable or non-navigable tributaries, which in itself is indicative of the acceptance of the procedure here sought for review of the Commission's order.

Union strongly urges that the decision in Carolina Aluminum Co. v. F. P. C., 97 F.2d 435, (Cir. 4th 1938) is controlling. The Court there squarely held that the Commission's decision was not a reviewable "order" because it "embodies no decision which is capable of being enforced by anyone" and, while "the statute forbids the construction of any project" after a Commission's jurisdictional determination, "it does not authorize the Commission to enter an order forbidding the construction." The Court's reasoning and decision in the Carolina Aluminum case is diametrically opposed to the Supreme Court's later ruling in Rochester Telephone Corp. v. United States, 307 U.S. 125, l. c. 132 and 133, 59 S.Ct. 754, l. c. 758, 83 L.Ed. 1147 (1939) which states:

> "Where a complainant seeks the Commission's authority under the terms of a statute and the Commission's action is followed by legal con-

sequences * * *, or where the Commission's order denies an exemption from the terms of the statute * * *, the road to the courts' jurisdiction seems to be clear. There is a constitutional 'case' or 'controversy,' * * *; and the suit is within the express language of the Urgent Deficiencies Act in that it is one 'to enjoin, set aside, or annul' an 'order of the Commission.' * * * While the penalties may be imposed by the statute for its violation and not for disobedience of the Commission's order, a favorable order would render the prohibitions of the statute inoperative. * * *"

Justice Frankfurter, in discussing so-called "negative" and "affirmative" orders, said "the concept of 'negative orders' has not served to clarify the relations between administrative bodies and the courts but has rather tended to obscure them." (307 U.S. l. c. 142, 59 S.Ct. l. c. 763, 83 L.Ed. 1147) and

> "We conclude, therefore, that any distinction, as such, between 'negative' and 'affirmative' orders, as a touchstone of jurisdiction to review the Commission's orders, serves no useful purpose, and insofar as earlier decisions have been controlled by this distinction, they can no longer be guiding." (307 U.S. l. c. 143, 59 S.Ct. l. c. 764, 83 L.Ed. 1147)

A more serious question arises in passing upon the question of whether the Commission's determination or order is supported by substantial evidence. The reviewing power of this Court is limited to determining whether the Federal Power Commission's findings of fact are supported by substantial evidence. § 825l (b) states in part "The finding of the Commission as to facts, if supported by substantial evidence, shall be conclusive."

The Commission contends that it has all the constitutional power Congress possesses to regulate control of hydroelectric projects of this character, while Union contends that Congress has a right to regulate only because of its authority to regulate foreign and interstate commerce

on navigable waters, although admitting that such power extended to non-navigable tributaries of a navigable river if the interests of navigation and flood control on the navigable river would be served by such project.

There is no question that Congress has authority over the non-navigable tributaries of a navigable river. In State of Oklahoma v. Guy F. Atkinson Co., 313 U.S. 508, l. c. 523, 61 S.Ct. 1050, l. c. 1058–1059, 85 L.Ed. 1487:

"* * * And it is clear that Congress may exercise its control over the non-navigable stretches of a river in order to preserve or promote commerce on the navigable portions. United States v. Rio Grande Dam & Irrigation Co., 174 U.S. 690, 703, 706, 708 [19 S.Ct. 770, 775–777, 43 L.Ed. 1136]; United States v. Utah, 283 U.S. 64, 90 [51 S.Ct. 438, 446, 75 L. Ed. 844]. It is obvious that, at least incidentally, Congress has done precisely that in this case. Congress was not unmindful of the effect of this project on the navigable capacity of the river. In authorizing it, Congress exercised all the power it possessed to control navigable waters."

It is not necessary to decide respondent's contention that Congress has delegated to the Commission all of its constitutional authority over the construction of hydroelectric projects as the statute itself 23(b) sets forth ample jurisdiction to cover this case and at the same time leaves to state control projects on non-navigable waters where "the interests of interstate or foreign commerce would [not] be affected," by expressly stating "permission is granted to construct such dam or other project works in such stream upon compliance with State laws."

The narrow question here presented is whether this Taum Sauk Project would affect the interests of interstate or foreign commerce. The Commission found that the interests of interstate commerce would be affected because the navigability of the Black River was affected and because the energy generated at such proposed project would be transmitted in interstate commerce by Union's interstate transmission lines.

The Commission's order held that Congress had jurisdiction over the stream (East Fork). Union does not take issue with this finding. Admittedly Congress has taken jurisdiction over the non-navigable tributaries of navigable waters and intends to retain and exercise such jurisdiction through the Federal Power Commission where any obstruction or construction on such non-navigable tributary would affect the interests of interstate or foreign commerce.

The order in part states "* * * In the past *the Commission has limited its investigation in this regard to a determination of whether a proposed project is capable of affecting the navigable capacity of any downstream navigable waters.*" The presiding examiner in this case similarly limited his decision. (Emphasis supplied).

The Commission's findings and order insofar as the issue of the effect on navigability is based upon the presiding examiner's report, which on this issue was adopted in full and its findings and order as respects the effect on the interests of interstate commerce by reason of the electrical energy being transmitted in interstate commerce is its own conclusion. The presiding examiner made a finding that "The proposed Taum Sauk Project will be constructed, operated and maintained for the development of power to supply markets not only in Missouri, but also in the state of Illinois, thereby affecting the interests of interstate or foreign commerce" (R. 159) but expressly stated that he felt it unnecessary to decide the issue thus presented, because of his findings concerning effect upon navigable capacity.

We shall first address ourselves to the consideration of the substantiality of the evidence to sustain that part of the order finding that the navigability of the Black River would be affected. This being basically a factual issue, it will be necessary to review at length the facts as stipulated and as found by the Commission, along

with its conclusions deduced therefrom. In order to analyze the factual situation and the effect of the project works upon the East Fork tributary to the Black River and its subsequent effect upon the navigability of the latter, it is necessary to describe somewhat in detail the project and its method of operation. The following summary, taken from the Report in the Record, includes to a limited extent the contention of both parties.

"Initially, when the project plant is first employed in the generation of electric energy it is contemplated that the upper pool will have in storage up to a maximum of 4350 acre feet. The flow of water during generation of electricity from the upper pool to the lower pool will vary depending upon the amount of water contained in the upper pool. For example, when generating at the rate of 350,000 kilowatts, the rate of flow of water from the upper pool to the lower pool will vary depending on the amount of water in the upper pool. The lower the level of water in the upper pool the greater the rate of flow from the upper pool to the lower pool. * * *"

* * *

"When the upper pool is filled there would be enough water stored to permit generation at the rate of 350,000 kilowatts to produce a total of approximately 2,750,000 kilowatt hours, corresponding to a full load operation of 350,000 kilowatts for about eight hours." (R. 87)

The pump-back operation "would take about 11 hours to fill the upper pool to 4350 acre feet," using power for the pumps at an average head of about 392,-000 kilowatts, depending upon the storage of water in the upper reservoir.

The dam will have a free crest at an elevation of 750 feet and a spillway providing maximum water surface of the dam at 763 feet, with a discharge capacity of 70,000 cubic feet per second.

Union in the normal operation of the pool proposes to regulate the outflow through the dam when the water surface is at 750 feet or less by means of sluice gates capable of discharging from 2000 to 2800 cubic feet per second. Union intends to regulate the outflow through the dam to correspond to the inflow to the lower pool from feeding streams by means of sluice gates and appropriate gaging stations to record inflows and outflows. We further quote from the Report in the Record:

"The Black River is downstream from the confluence of Taum Creek and the East Fork of the Black River and is part of the navigable water of the United States, being navigable from a point at the mouth of the East Fork four miles below the site of the proposed dam, to the mouth of the Black River."

* * *

"In this case Union's position is that the construction, operation and maintenance of the Taum Sauk project works, is capable of having only an insignificant or de minimis effect upon the navigability of the Black River.

"The Staff's position on the other hand, is that the facts agreed upon show that the project works are capable in certain circumstances of having a 'measurable' or 'pronounced' effect. The Staff's position is that the stipulated facts and the evidentiary support found in the exhibits received reflect a capability that the project works will have a substantial effect upon the navigability of the Black River and that therefore the license provisions are applicable. * * * It is Union's position that the 'capability' test advocated by the Staff is not the law. Union urges on the contrary that to establish licensing jurisdiction [on non-navigable streams] it must be shown that the construction, operation, and maintenance of the project works will have an 'inevitable' effect on the navigability of the Black River." (R. 89–91)

Union cites for its position United States v. Appalachian Electric Power Co., D.C.,

23 F.Supp. 83, 105, and 4 Cir., 107 F.2d 769 and 790. The Supreme Court reversed the Court of Appeals' decision dealing with this issue when it ascertained that the damsite was on a navigable stream, but Union contends the principles enumerated in the decision as it pertains to non-navigable streams would stand. United States v. Appalachian Electric Power Co., 311 U.S. 377, 61 S.Ct. 291, 85 L.Ed. 243 (1940).

On this issue the Staff cites Citizens Utilities Co. v. Federal Power Commission, 2 Cir., 279 F.2d 1 (1960) and Carolina Aluminum Company, 19 FPC 704 (1958) and contends the holding in such cases to be "that where a showing is made that the construction, operation and maintenance of hydroelectric project works located on non-navigable water is capable of having a measurable effect on navigable water of the United States downstream that then the licensing provisions of the Act are applicable."

In the Citizens Utilities case, the Court of Appeals for the Second Circuit held the Commission had licensing jurisdiction for the project, even though it was constructed across the river at a point where there was a question whether the river was navigable, as the operation of the dams was capable of affecting temporarily the flow of water at a lower point in the stream, which was navigable and did so in the *ordinary operations of such dams.*

The Carolina Aluminum Company case (supra) decided by the Commission held in effect that the project works were subject to the licensing provisions where "such hydroelectric development is capable of having [an effect] upon navigable capacity at points downstream." The Taum Sauk project works is a pump-back storage project, which facilities are different from the type of hydroelectric facilities which use the potential energy in natural flows of the stream to generate electric energy and which alternately store and release the natural flows from the stream. Further quoting or summarizing from the Report in the Record:

"* * * As Union contemplates the operation water will be impounded only one time in the lower pool, causing a temporary reduction in the downstream stage and thereafter on a daily cycle the water in the lower pool will be pumped up to the upper pool and later released.

"After the impounding of the water in the lower pool has been completed, it is expected by Union that water will be discharged through or over the dam in amounts equal to the inflow into the lower pool from the streams above and that, therefore, the streams below the project will not be affected by the existence or operation of the plant. On this basis it is claimed that there will be no effect on the navigability of the Black River.

"The Staff, on the other hand, claims that when physical conditions are considered in connection with the construction, maintenance, and operation of the project works, particularly in regard to the drainage conditions in the Upper Black River Basin and when the water flows which have been measured over past years are considered the only reasonable conclusion to be reached is that the project works have the capability of affecting the navigability of the Black River. * * *" (R. 94 and 95)

The record shows on mathematical calculations that the flows at the proposed dam of the lower pool would:

1. Equal or exceed 50 cubic feet per second approximately 50 per cent of the time;

2. Equal or exceed 100 cubic feet per second about 25 per cent of the time;

3. Equal or exceed 200 cubic feet per second about 10 per cent of the time;

4. Have exceeded 2,000 cubic feet per second less than ½ of 1 per cent of the time; and

5. Have exceeded 7,000 cubic feet per second on three occasions.

"These varying flow conditions when considered together with the physical character of the project works are capable of affecting navigability on the Black River in differing degrees dependent in large part upon the flow conditions at the times being considered [the navigability of the Black River is based upon evidence showing that ties and timbers were floated down the river and that float trips had been taken by flat-bottomed boats down the river]. In this connection, the Staff has given consideration to five situations where the proposed project works would be capable of affecting the navigability of the Black River, to wit:"

a. during the filling period;

b. during high flows;

c. during malfunctions of facilities;

d. during emergency operations of the Taum Sauk plant; and

e. during average flows and normal operations of the project. (R. 95-96)

During the filling period, if 50 cubic feet per second were stored taken from the average flow of 105 cubic feet per second, the lower pool would fill in approximately 63 days. The water level, at the Annapolis gage of the Black River would be reduced about one tenth of a foot and the river on the East Fork about 3.7 miles below the damsite would be reduced about one foot. This is a one-shot operation which should not be repeated. This slight diminution in flow through the filling period, in its temporary aspect and its lack of practical significance during that time is de minimis and not of substance as a basis for claiming that navigability is affected and that the Commission thus has jurisdiction.

Further quoting or summarizing from the Record, during high flow periods which had occurred three times in the past, the generating cycle would add to the natural peak flow past the dam of the lower pool by increasing it from 17,600 cubic feet per second to 21,800 cubic feet per second, and the dam at the lower pool would reduce the natural stage below the dam by 0.2 feet to 0.4 feet with no plant operation. (R. 98) The pumping cycle of itself would reduce the natural stage below the dam of the upper pool by 0.8 feet but the generating cycle would increase the stage below the dam above natural stage by one foot during the high flows, such as occurred May 9-10, 1950.

"During stream flows of 2,800 feet per second or less into the lower pool and for the normal cycles of generation and pumping for the projects works there would be no increase or decrease in the natural stage and flow below the project works, assuming no emergency operations, and no malfunctions of facilities. * * * " (R. 98)

The Examiner, however, engaged in these speculative considerations:

"It cannot reasonably be said that the possibility of malfunction or mechanical failure does not exist in this project. There certainly exists the possibility of human or mechanical failure. In this project the possibility of such failure exists through the improper operation of stream gages, failure of the stream flow facilities to record correctly the inflows and outflows or to transmit flow information to the control points, clogging of the intake to sluiceway works, or failure of facilities. If there were malfunction during periods of flood and the generators were employed it would affect navigability severely, particularly because the effect of generation would be to add to the unusual accretion of water." (R. 99)

In another hypothetical situation the report sets forth that during a period of low flow the abrupt release of water through the sluiceway could result in the dumping of 2,000 cubic feet per second from the lower pool. This part of the

Examiner's Report concludes with the statement:

" \* \* \* Most of the time navigability of the Black River would not be substantially affected but there will be times when it will be affected. The problem to be resolved, however, is not whether the Commission should extend its attention to situations where the effect on navigability is not always substantial or is not continuous but whether under the law navigability will be affected to a measurable degree by the maintenance, construction, and operation of the project works. Here it will be so affected." (R. 100)

The Stipulation of Facts contained the following hypothetical calculation. (R. 81–82) The abnormal situation of the lower pool being full when a generating cycle is started and where the natural flow in the East Fork is 105 cubic feet per second; the natural flow in the Black River at the Annapolis gage 582 cubic feet per second; the sluice dam is closed and not operated; and a generating cycle at a rate of 350 megawatts (average turbine discharge 6,800 cubic feet per second) is started and continues until all of the water is withdrawn from the upper pool. Assuming all of the above facts were to occur simultaneously, the lower pool would overflow over the free crest of the dam for eight hours, and the East Fork below the dam would be increased to approximately 7 feet. The Lesterville gage on the Black River would increase 5.7, cresting about nine hours after the start of the generating cycle. Between the Lesterville gage and the Annapolis gage approximately 2100 acre-feet of valley storage would operate to reduce the increase in stage at the Annapolis gage from the 5.7 feet experienced at the Lesterville gage to 3.4 feet, cresting 14½ hours after the start of the generating cycle with a maximum rate of rise of approximately 0.6 feet per hour. As at the Lesterville gage the stage would subside gradually to the normal stage after the crest, and "On numerous occasions, natural conditions have caused

both greater rates of rise and greater increases in stage in equal periods of time." (R. 82)

The normal operation of the project would as contemplated neither increase or decrease the natural flow on the East Fork, and, absent a malfunction of the facilities, would have no effect upon the navigability of the Black River unless the flow would exceed 2,000 cubic feet per second, which it has only done ½ of 1 per cent of the time and that there would be in addition a malfunction of the sluice gates, which could handle a flow of 2,800 cubic feet per second, and the lower pool full when a generating cycle is started. The malfunctioning of facilities, unless the evidence establishes such malfunctioning during the normal course of operations, should not be presumed as hypothesized by the Commission. Even under the abnormal hypothesized situations posed by the Commission, the Stipulation of Facts and the Examiner's Report, there would be no change in the natural flow of water into the East Fork and thence the Black River if the generating cycle were stopped by Union. The pumping cycle, of course, would only reduce an abnormal high flow. In addition, as stipulated, "On numerous occasions, natural conditions have caused both greater rates of rise and greater increases in stage in equal periods of time." (R. 82).

The lengthy and complete Report of the presiding examiner, which is adopted by the Commission in its order, stresses hypothetical situations which could only be reasonably hypothesized during a period when the flow in the East Fork would exceed 2,800 cubic feet per second. Based on an 18-year record of flows, the flow at the damsite would not exceed 2,000 cubic feet per second 99½ per cent of the time and has only exceeded 7,000 cubic feet per second on three occasions during that period. The sluice gates are capable of discharging 2,800 cubic feet per second so that, absent any malfunctioning of the sluice gates, we are here dealing with an analysis of what might happen less than one-half of 1 per cent of the time. To find an effect upon navigability,

the examiner and the Commission then must hypothesize various malfunctions of the project during this less than ½ of 1 per cent of the time where either certain flood conditions or high flow conditions would prevail. (R 95 and 96) The natural effect of such high flow conditions on navigability has caused a greater rate of rises in the stream and greater increases in stage during equal periods of time as stipulated in the Record. Under these circumstances, we fail to find substantial evidence upon which to base the Commission's finding that the navigability of the Black River would be affected.[2]

The Examiner's Report, which was adopted in toto by the Commission on this point, gives no consideration to the requested expert opinion of the Corps of Engineers of the United States Government, which stated that "construction and operation of the applicant's project would have no appreciable effect on the Clearwater reservoir project or navigation on the Black River." Said letter also contained a statement "The plans of the structure are satisfactory insofar as the interests of navigation are concerned. The terms and conditions for insertion in the license in the interest of navigation are not considered necessary." [3]

A greater part of the Commission's order advances the novel theory that the Commission has jurisdiction over the project works by reason of the fact that the electric energy generated at such works would be transmitted in interstate commerce. This viewpoint is a complete departure from previous Commission policies. The presiding examiner was asked to pass upon this issue but did not do so, basing his recommendation for licensing on the effect of the project works on navigation downstream.[4]

2. "During stream flows of 2800 feet per second or less into the lower pool and for the normal cycles of generation and pumping for the project works there would be no increase or decrease in the natural stage and flow below the project works, assuming no emergency operations, and no malfunctions of facilities." (R. 98)

3. "Exhibit 10
18 August 1960
"Chairman
Federal Power Commission
Washington 25 D.C.
"Dear Mr. Chairman:
"The Commission's letter dated 30 June 1960 requested comments and recommendations in regard to the application for license filed by Union Electric Company for proposed hydroelectric project No. 2277 to be located on East Fork of Black River in Missouri.
"The proposed dam would be located approximately 15 miles upstream from the upper limit of the Corps of Engineers' Clearwater Reservoir project and about 85 miles above the head of an authorized navigation project (inactive) on the Black River. Construction and operation of the applicant's project would have no appreciable effect on the Clearwater Reservoir project or navigation on the Black River.
"The plans of the structures are satisfactory insofar as the interests of navigation are concerned. Terms and conditions for insertion in the license in the in-

terest of navigation are not considered necessary.
"One copy of the application is returned as requested.
Sincerely yours,
/s/ ROBERT M. TARBOX
ROBERT M. TARBOX,
Colonel, Corps of Engineers,
Assistance Director of Civil Works for Southwestern Divisions."

4. Pertinent parts of the record are:
"The Examiner stated that he felt it unnecessary to decide the issue thus presented because of his findings concerning effect upon navigable capacity. Although he did not base his decision thereon, he did make the following finding of fact:
"The proposed Taum Sauk project will be constructed, operated and maintained for the development of power to supply markets not only in Missouri but also in the state of Illinois, thereby affecting the interests of interstate or foreign commerce." (R. 159)
"A similar argument was advanced by staff and rejected by the Circuit Court in United States v. Appalachian Power Co., 107 F.2d 769 (4th Cir., 1938), at the same time that that court endorsed a narrow concept of navigability. The Circuit Court was reversed on this latter ground by the United States Supreme Court at 311 U.S. 377 [61 S.Ct. 291, 85 L.Ed. 243] (1940) in a way which made it unnecessary to decide issues presented only in

The Federal Power Act originally enacted on June 10, 1920, as the Federal Water Power Act was a successor to § 18 of the Rivers and Harbors Act of 1899 and succeeding acts. Section 23(b) of the Act (16 U.S.C.A. § 817) was amended in 1935 by adding the first sentence of that Section, which prohibits all unlicensed hydroelectric projects on navigable waters in the United States. The second sentence of that Section does not prohibit unlicensed hydroelectric projects on non-navigable waters but only calls for licensing if the proposed construction would affect the interest of interstate or foreign commerce. Union contends that a proper interpretation of that part of § 23(b) relating to non-navigable waters should be confined to the determination of whether the construction of such project would affect commerce on navigable waters, and contends that the Commission's interpretation or determination broadening the Act to include any projects on nonnavigable waters where the electric energy therefrom is transmitted in interstate transmission lines is contrary to the construction of said Section which had been followed by the Commission itself for many years prior to the issuance of its order and opinion in this case, and further contends that such interpretation

conflicts with applicable judicial decisions. Under the Rivers and Harbors Acts, an Act of Congress was necessary before a dam could be constructed in navigable waters or in a non-navigable stream if such project would constitute an obstruction to the navigable capacity of navigable waters. The Federal Water Power Act of 1920 created the Federal Power Commission and empowered it to perform the licensing functions listed in §§ 4(e) and 23(b) of the Act, theretofore exercised by Congress. The United States Supreme Court in State of Oklahoma v. Guy F. Atkinson Co., 313 U.S. 508, 61 S.Ct. 1050, 85 L.Ed. 1487, held specifically that "Congress may exercise its control over the non-navigable stretches of a river in order to preserve or promote commerce on the navigable portions," and in authorizing such control Congress exercised all the power it possessed to control navigable waters.

 Union contends that the Court in United States v. Appalachian Electric Power Co., 311 U.S. 377, 61 S. Ct. 291, 85 L.Ed. 243 delineated the constitutional limit of Congress's power to prohibit and to license water power projects founded upon its authority to regulate commerce on those waters; and, it is the interest of commerce on water and

connection with non-navigable streams. This is the first time that the Commission itself has decided the issue, whether an effect on the interests of interstate commerce other than an effect on navigable capacity is sufficient to require the licensing of projects on non-navigable waters under the mandate of Section 23 (b). Although it may be technically unnecessary to the decision in this case, an issue of such importance must not be allowed to go unresolved any longer since there can be little doubt that this country in the years ahead will become overwhelmingly more dependent upon the maximum development of its water resources in all their uses.

\* \* \* \* \*

"In view of these facts, we cannot hold as requested by Union that 'the interests of interstate commerce' in Section 23(b) are limited to 'effect upon navigable capacity.' On the contrary, we hold that the development of power for interstate transmission and use is such an effect

upon the interests of interstate commerce within the meaning of Section 23 (b) that a project proposed for that purpose, which is to be constructed in and will utilize non-navigable waters over which Congress has jurisdiction under the commerce clause, must be licensed. If the water resource is one over which Congress has jurisdiction and if the water resource has the potential of affecting interstate commerce in any manner, it is our duty to license its use to preserve the rights of the people in the resource. In this case, the proposed development of power for interstate transmission and use is sufficient evidence of the East Fork's potential to affect interstate commerce to cause us to require a license, even if it were not shown that downstream navigable capacity will be affected. We concur, however, in the conclusion of the Examiner that the Commission has license jurisdiction because of effect on downstream navigable capacity." (R. 162–163)

not the interest of commerce conducted by other media which must be affected by the construction of a hydroelectric project on a non-navigable stream in order to bring the licensure provisions of the Act into effect.

We are not in accord with Union's narrow construction of congressional authority over the interests of commerce on navigable waters. The Appalachian case originated by the Government seeking an injunction to enjoin construction of a dam without a license from the Federal Power Commission. The United States Court of Appeals, Fourth Circuit, in United States v. Appalachian Electric Power Co., 107 F.2d 769, adopted the restricted theory on the narrow issue of impairment of navigability on downstream capacity stating, l. c. 790:

> "The plaintiff [U. S.] was not entitled to the injunction in this case unless it established an existing or presently threatened impairment of navigable capacity of the Kanawha [river]; and * * * the plaintiff must show that the injury sought to be avoided by the injunction will be necessary or practically certain, and not merely the probable, result of the acts whether intended or not."

That Court was expressly reversed by the Supreme Court on appeal, the latter Court holding, 311 U.S. 377, l. c. 426, 61 S.Ct. 291, l. c. 308, 85 L.Ed. 243;

> "In our view, it cannot properly be said that the constitutional power of the United States over its waters is limited to control for navigation. By navigation respondent means no more than operation of boats and improvement of the waterway itself. In truth the authority of the United States is the regulation of commerce on its waters. Navigability, in the sense just stated, is but a part of this whole. Flood protection, watershed development, recovery of the cost of improvements through utilization of power are likewise parts of commerce control. * * * That authority is as broad as the needs of commerce."

We believe without delineating all of them that there are other considerations such as proper development of watershed areas, flood control and proper utilization of natural resources that would have an effect upon navigability and as such would be proper items of consideration in passing upon whether the interest of foreign or interstate commerce would be affected. All of these factors relate, of course, to the development and use and continued use of the water resources of the nation. It would appear that the method of generation of electrical energy in and of itself would be of no concern to the Commission, unless the proposed project works would affect the interests of interstate or foreign commerce on the navigable waters of the United States. Admittedly, the Federal Power Commission has no control over the construction and operation of steam-generating plants that do not fall within the category mentioned in § 23(b).

The Supreme Court in Utah Power and Light Co. v. Pfost, 286 U.S. 165, 52 S.Ct. 548, 76 L.Ed. 1038, in dealing with the issues raised by a state tax on the generation of electrical energy by the state of Idaho and resisted by the Power Company on the basis that its operation was in interstate commerce and hence the tax a burden thereon held that the generation of electricity was intra-state activity regardless of whether the electricity was transmitted interstate. The question there posed by the Court was:

> "Upon the facts of the present case is the generation of electrical energy, like manufacture or production generally, a process essentially local in character and complete in itself; or is it so linked with the transmission as to make it an inseparable part of a transaction in interstate commerce?"
>
> * * *
>
> "While conversion and transmission are substantially instantaneous, they are, we are convinced, essentially separable and distinct operations ( [286 U.S.] l. c. 179 [52 S.Ct. l. c. 551, 76 L.Ed. 1038] ) * * * the gen-

erator and the transmission lines perform different functions, with a result comparable, * * * to the manufacture of physical articles of trade and their subsequent shipment and transportation in commerce." (286 U.S. l. c. 180 and 181, 52 S.Ct. l. c. 551 and 552, 76 L.Ed. 1038) and concluded:

"We are satisfied, upon a consideration of the whole case, that the process of generation is as essentially local as though electrical energy were a physical thing; and to that situation we must apply, as controlling, the general rule that commerce does not begin until manufacture is finished, and hence the commerce clause of the Constitution does not prevent the state from exercising exclusive control over the manufacture. Cornell v. Coyne, 192 U.S. 418, 428–429 [24 S.Ct. 383, 48 L.Ed. 504]. 'Commerce succeeds to manufacture, and is not a part of it.' United States v. E. C. Knight Co., 156 U.S. 1, 12 [15 S.Ct. 249, 253, 39 L.Ed. 325]."

The Court then went on to hold that the petitioner's production of electrical energy in Idaho was purely intra-state business and that its transmission across state lines was interstate business.

In the light of the fact that the generation of electrical energy is a local or intra-state activity, we fail to see any difference between a generation of such energy by hydroelectric projects on non-navigable streams and the generation of such energy by steam plants that would support the doctrine now announced by the Federal Power Commission that the mere transmission of electrical energy in interstate lines in and of itself would give it jurisdiction to license the generating project. While the Commission, of course, has authority over the interstate transmission lines under Part II of the Federal Power Act, that power, in our opinion, is without relevancy to its authority and responsibility to deal with the matter of licensing under § 23(b), as the question of the effect of a construction project on interstate commerce must be viewed in its relation to navigable waters. The Commission's jurisdiction thereof must logically rest upon its delegated congressional jurisdiction over the interests of commerce on navigable waters.

What would happen to the Commission's jurisdictional basis on this theory, if the energy generated is not transmitted in interstate lines or, if after a period of initial transmission, such interstate use is permanently discontinued? The basis of such jurisdiction ceases to exist, whereas, the basis of navigability once having been found to exist, continues uninterrupted. There does not appear to be any correlation between generation of electrical energy in and of itself and the interests of foreign or interstate commerce.

This same issue was considered by the Court of Appeals for the Fourth Circuit in the Appalachian Electric Power Co. case (supra) where a contention was made that the Commission had jurisdiction over dams proposed to be constructed on non-navigable waters irrespective of the effect of the dam on navigable waters because the dam is intended to transmit electric power outside of the state of Virginia. There the Commission contended "Thus the primary purpose of the legislation was the control of water power development, not of navigation." (107 F.2d l. c. 793), which the Court answered stating "We do not think this broad construction of the Act based on the interstate commerce power, to the extent that it is dissociated from navigation, is tenable either on the basis of statutory construction or constitutional authority." (107 F.2d l. c. 793) and

"The broad construction of the section now contended for runs counter to established legal principles. Where the interests of navigation are not involved (and where the United States does not itself possess property rights) the control of the use of the flowing water and the rights therein of riparian owners are subject to the laws of the several

states. * * * If the river were federally navigable the rights of the riparian owners would of course be fully subject to the federal servitude in the interests of navigation; but the riparian owner on a non-navigable stream is entitled to reasonable use of the flowing waters (not impairing downstream navigable capacity) subject to no easement in favor of navigation; and this is a property right which cannot be taken from him without just compensation. * * *

* * * * *

"We therefore cannot adopt the plaintiff's construction of section 23 that the Commission has jurisdiction over non-navigable streams under the interstate commerce clause irrespective of the interests of navigation." (l. c. 107 F.2d 796)

While the Appalachian case was reversed by the Supreme Court on the ground that the project was to be constructed on a navigable river the Court did not pass upon the Court of Appeals' determination with respect to the application of § 23(b) to projects on non-navigable waters.

The construction now contended for by the Federal Power Commission is contrary to its own published decision in the California Oregon Power Co., 13 F.P.C. 1 (1954), case where the Commission rejected as "unwarranted" a conclusion of the trial examiner that a license was required under § 23(b) because the energy generated would be transmitted in interstate commerce. The Commission there said:

"As stated above, the Examiner found that proposed Project No. 2082 will and the five existing projects are utilizing water for the generation of electric energy which in turn is transmitted in interstate commerce, and he concluded that in such way they affect the interests of interstate commerce, and are therefore subject to the licensing authority of the Commission. We reject that conclusion as unwarrant-

ed under the Federal Power Act. (l. c. 13 F.P.C. 3)"

Apparently the Commission had uniformly construed its authority or jurisdiction in conformity with the California Oregon Power Co. case since 1920 until its change in the present case. This represents a decided departure from its administrative construction of that statute, but, of course, would not necessarily be controlling if it did actually have jurisdiction and authority under § 23(b). It is, however, suggestive that its contention now is a novel one not based upon generally acknowledged limits of jurisdiction adhered to throughout the years.

Union's Declaration of Intention was the 212th such Declaration under § 23(b) since 1920. Of the 211 prior declarations, the Commission found a license was required in 77 cases [Federal Power Commission 41st Annual Report (1961) p. 49.] In its Forty-Second Annual Report (1962), page 23, the Commission, in commenting upon its Opinion and Order in this proceeding, stated:

"Past Commission findings with respect to hydroelectric projects not affecting Government lands or dams have been limited to determinations of whether the projects occupied navigable waters of the United States or affected their navigable capacity."

This administrative view and construction of the Commission's jurisdiction under 23(b) being limited to navigable waters or on non-navigable waters that would affect the navigability of navigable waters has long been known to Congress and no change having been made therein, "Under the established rule Congress must be taken to have approved the administrative construction and thereby to have given it the force of law". Helevering v. R. J. Reynolds Tobacco Co., 306 U.S. 110, 114–115, 59 S.Ct. 423, 425–426, 83 L.Ed. 536.

We, therefore, find that the Commission's determination that it has jurisdiction of the project works solely on the ground that the electrical energy will be

transmitted in interstate commerce is unsound and not supported in law.

In the situation at hand it appears from the record that the Taum Sauk Project, absent a short period of construction, would have no effect whatever upon the normal flow of the East Fork of the Black River; that in the usual and ordinary operation of the project·all of the normal flow of the East Fork would flow in the usual and normal amounts below the lower reservoir of the project and hence would and could not have any effect upon the navigability of the Black River; that only in times of high abnormal flow with a malfunctioning of the facility including a continued operation of the generating cycle would the flow be increased so that possibly navigation might be affected or impaired by an increased flow into the Black River. It would thus appear that there are no factual findings supported by substantial evidence upon which to base a determination that such project would affect the interests of interstate or foreign commerce and the navigability of the Black River. The only expert opinion in the record is from the office of the Chief Engineer of the United States Corps of Engineers and it is to the contrary. The hypothetical situations propounded in the Commission's Opinion and Order are too conjectural upon which to base the Commission's finding of effect on navigability. Such hypothetical situations would occur only upon a combination of adverse circumstances coupled with malfunctioning and inept operation that should not be presumed. In addition "on numerous occasions, natural conditions have caused both greater rates of rise and greater increases in stage in equal period of time" (R. 82) than the hypothetical conditions propounded by the Commission. The Commission's theory of jurisdiction based solely on interstate transmission of electrical energy generated at the project is unsound and not warranted under the law.

 This project is not without regulation, as both the state of Missouri

and the county of its location have certain regulatory rights which we must presume will be properly administered. The project itself is local in character and intra-state in its operation of generating electrical energy and upon the evidence contained in the record would not have any effect upon the navigability of the Black River nor would the interests of interstate or foreign commerce be affected.

 If in the operation of the project it later develops at any time in the future that the navigability of the Black River is impaired or threatened to be impaired, the Commission would have authority under § 4(g) of the Act to issue an appropriate order, including an order to prevent further operation of the project without a license. Section 4(g) of the Act empowers the Commission

"(g) Upon its own motion to order an investigation of any occupancy of, or evidenced intention to occupy, for the purpose of developing electric power, public lands, reservations, or streams or other bodies of water over which Congress has jurisdiction under its authority to regulate commerce with foreign nations and among the several States by any person, corporation, State, or municipality and to issue such order as it may find appropriate, expedient, and in the public interest to conserve and utilize the navigation and waterpower resources of the region. [16 U.S.C.A. § 797(g)]"

Under that Section orders have been issued by the Commission requiring the proprietor of an existing project to apply for a license for maintenance and operation of the project. And such orders have been upheld. Pennsylvania Water & Power Co. v. Federal Power Commission (1941), 74 App.D.C. 351, 123 F.2d 155; Montana Power Company v. Federal Power Commission (1950), 87 U.S. App.D.C. 316, 185 F.2d 491.

This proceeding, setting aside the Commission's order and findings would have no effect upon a later proceeding under § 4(g) as this decision is based solely

on the record made in this case. If evidence is later adduced upon which to base a finding of effect upon the navigability of the Black River, the Commission could make a finding and issue an order in accordance therewith and any substantial evidence showing an effect upon the navigability of the Black River would suffice to meet the proper legal standards.

We, therefore, hold that the order, and the findings and conclusion of the Commission upon which it is based is set aside as erroneous in law and unsupported by substantial evidence.