**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**DEC 1 2004**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

FUEL SAFE WASHINGTON,

Petitioner,

v.

FEDERAL ENERGY REGULATORY
COMMISSION,

Respondent,

No. 03-9577

----------------------------------

POWEREX CORP. and GEORGIA
STRAIT CROSSING PIPELINE LP,

Intervenors,

----------------------------------

WHATCOM COUNTY,

Amicus Curiae.

---

APPEAL FROM ORDERS OF THE
FEDERAL ENERGY REGULATORY COMMISSION
(F.E.R.C. NOS. CP01-176, CP01-177, CP01-178, CP01-179)

---

Angela Coats, Student Intern, Brett Durbin, Student Intern, and Michael J.
Robinson-Dorn, Assistant Professor of Law & Director, Kathy and Steve Berman
Environmental Law Clinic, University of Washington, School of Law, Seattle,
Washington, for Petitioner.

Judith A. Albert, Attorney (Cynthia A. Marlette, General Counsel, and Dennis Lane, Solicitor, with her on the brief), Federal Energy Regulatory Commission, Washington, D.C., for Respondent.

Steven W. Snarr, Georgia Strait Crossing Pipeline LP, Salt Lake City, Utah (Charles H. Shoneman and Jacqueline R. Java, Bracewell & Patterson, L.L.P., Washington, D.C., with him on the brief), for Intervenors, Georgia Strait Crossing Pipeline LP and Powerex Corp.

Randall J. Watts, Chief Civil Deputy Prosecuting Attorney for Whatcom County, Bellingham, Washington, filed an amicus curiae brief for Whatcom County.

---

Before **LUCERO** , **ANDERSON** , and **McCONNELL** , Circuit Judges.

---

**ANDERSON** , Circuit Judge.

---

Petitioner Fuel Safe Washington ("FSW") seeks review of two orders by the Federal Energy Regulatory Commission ("FERC") granting a Certificate of Public Convenience and Necessity ("CPCN") to Georgia Strait Crossing Pipeline LP ("GSX"), permitting GSX to build a new natural gas pipeline and ancillary facilities in northwest Washington state, and denying requests for rehearing. FSW asks us either to vacate FERC's final orders or, alternatively, to remand this matter to FERC for further proceedings. We decline to vacate FERC's orders or remand for further proceedings. The petition for review is therefore denied.

## BACKGROUND

Pursuant to the Natural Gas Act, FERC has plenary jurisdiction over (1) "the transportation of natural gas in interstate commerce"; (2) "the sale in interstate commerce of natural gas for resale for ultimate public consumption"; and (3) "natural-gas companies engaged in such transportation or sale." 15 U.S.C. § 717(b). See City of Fort Morgan v. FERC, 181 F.3d 1155, 1159 (10th Cir. 1999). There is an exception from FERC jurisdiction, called the Hinshaw Amendment exception, which excludes from FERC's jurisdiction a natural gas company's activities if (1) the company receives all gas "within or at the boundary of a State"; (2) "all the natural gas so received is ultimately consumed within such State"; and (3) the service of that intra-state gas, and the accompanying facilities and rates, are "subject to regulation" by the state. 15 U.S.C. § 717(c); see also City of Fort Morgan, 181 F.3d at 1159.

Prior to constructing or operating any natural gas pipeline and related facilities, a company subject to FERC's jurisdiction must obtain from FERC "a certificate of public convenience and necessity," 15 U.S.C. § 717f(c)(1)(A), indicating FERC's determination that the proposed service "is or will be required by the present or future public convenience or necessity." 15 U.S.C. § 717f(e).

As a part of its review process before issuing a CPCN, FERC conducts an environmental analysis under the National Environmental Policy Act ("NEPA"),

-3-

42 U.S.C. §§ 4321-70f, which "'prescribes the necessary process' by which federal agencies must 'take a hard look at the environmental consequences' of their proposed actions." Lee v. U.S. Air Force, 354 F.3d 1229, 1237 (quoting Utahns for Better Transp. v. U.S. Dep't of Transp., 305 F.3d 1152, 1162-63 (10th Cir. 2002), modified, 319 F.3d 1207 (10th Cir. 2003) (further quotation omitted)). In contemplating "'major Federal actions significantly affecting the quality of the human environment,' agencies must prepare an environmental impact statement ("EIS") in which they consider the environmental impact of the proposed action and compare this impact with that of 'alternatives to the proposed action." Id. (quoting 42 U.S.C. § 4332(2)(C)).

On April 24, 2001, GSX applied for CPCNs to construct and operate a natural gas pipeline and accompanying facilities in Whatcom and San Juan Counties, Washington. The proposed pipeline would

> carry gas east to west, from the Canadian border near Sumas, Washington, overland across Whatcom and San Juan Counties, Washington, then underwater across the Strait of Georgia, to a subsea interconnection mid-channel in the Boundary Pass at the international border between the United States and Canada. The onshore facilities will consist of approximately 32.1 miles of 20-inch pipe, 1.4 miles of 16-inch pipe, a 10,302 horsepower (ISO-rated) compressor station at Cherry Point, Washington, and a receipt point meter station at the border near Sumas. The offshore facilities will consist of approximately 14 miles of 16-inch pipe, with a subsea tap valve assembly near the San Juan Islands.

Georgia Strait Crossing Pipeline LP, 100 F.E.R.C. ¶ 61,280, at 62,191 (2002) (footnote omitted).  At Sumas, the east terminus of the pipeline, the proposed line would interconnect with a Canadian pipeline, Westcoast Energy Inc. and with a United States pipeline, Northwest Pipeline Corporation.  At its west subsea terminus, the pipeline would interconnect with a new pipeline to be built and operated by Georgia Strait Crossing Pipeline Ltd ("GSX-Canada") which would transport gas from the interconnection point to Vancouver Island, British Columbia.  While it was clear that the pipeline was primarily designed to transport Canadian gas to Canadian consumers on Vancouver island, the system was designed from the beginning to permit as much as 10% of its capacity to, at times, be transported through the Northwest connection to United States markets.[1] GSX proposed that Powerex, a British Columbian corporation, would be the initial transportation service customer.

On June 1, 2001, FERC sent a "Notice of Intent to Prepare an Environmental Impact Statement for the Proposed Georgia Strait Crossing

---

[1]GSX's application for CPCNs stated that "[a]lthough the GSX project is designed to physically flow gas only in one direction, from Sumas to Vancouver Island, the system will be able to accommodate backhauls by displacement.  For example, if Centra has off-peak excess supply on its system, such supply could be backhauled to markets in the U.S. via displacement of scheduled GSX system deliveries to Centra."  Application for Certificates of Public Convenience and Necessity at 20, R. Vol. I.  Centra is Centra Gas British Columbia Inc., a distribution affiliate of Westcoast.

Project, Request for Comments on Environmental Issues, and Notice of Public Scoping Meetings and Site Visit" ("NOI") to 339 interested parties. FERC held two public meetings in Washington State and received comments on the proposed project throughout the summer of 2001.

On December 10, 2001, FERC's staff filed its draft EIS ("DEIS") with the Environmental Protection Agency ("EPA"), announced it in the Federal Register, and mailed it to individuals and organizations on a mailing list created for the project. Under Council on Environmental Quality ("CEQ") regulations implementing NEPA, 40 C.F.R. §§ 1500-08, the public had until February 4, 2002, to comment on the DEIS. The Commission held another public meeting in Washington on February 26, at which twenty-five people made statements. The Commission received comments on the DEIS from four federal agencies, five state agencies, five local agencies and elected officials, two Native American groups, six companies and organizations, ten individuals, and the applicant, GSX.

Meanwhile, the Commission proceeded with its review of the non-environmental aspects of the project. It published notice of GSX's application in the Federal Register on May 4, 2001. Twenty-four parties filed motions to intervene. On March 13, 2002, FERC issued a Preliminary Determination, concluding that, subject to completion of the environmental review process, the benefits of the proposed project outweighed the potential adverse effects. None

of the parties to this case requested a rehearing of the Preliminary Determination. On June 17, 2002, Whatcom County filed a motion to dismiss GSX's application, or alternatively seeking an evidentiary hearing, arguing that FERC lacked jurisdiction over the pipeline under § 7 of the NGA because the gas supply sources and end consumers were Canadian, and there was therefore no interstate transportation of the gas. On July 17, 2002, FERC issued the FEIS. Following the issuance of the FEIS, FERC received further comments from two individuals, the EPA, and the United States Public Health Services, Department of Health and Human Services ("HHS").

On September 20, 2002, FERC issued a final order denying Whatcom County's motion to dismiss, analyzing the environmental issues and issuing a CPCN authorizing the construction and operation of the proposed pipeline. In that order, FERC responded to the comments made on the FEIS by the EPA, HHS and the two individuals. Whatcom County did not seek rehearing of the final order and FSW only requested rehearing of the environmental issues. The Commission addressed the environmental issues in its rehearing order, and rejected FSW's arguments.

On March 17, 2003, FSW petitioned for review in the Ninth Circuit. FERC filed a motion to dismiss on the ground of improper venue. On July 30, 2003, the Ninth Circuit transferred the case to this court and, on October 17, 2003, the

Commission filed the certified index to the record. Georgia Strait and Powerex intervened in the proceedings before this court. Meanwhile, on September 3, FSW had requested the Commission to reopen the evidentiary record and prepare a supplemental EIS. FERC denied the request. This petition for review followed.

## DISCUSSION

### I.    Jurisdiction

As indicated above, FERC has plenary jurisdiction over the transportation of natural gas in interstate commerce. FSW argues that FERC improperly exercised jurisdiction over the proposed pipeline because the pipeline will not transport gas in interstate commerce. To the contrary, FSW argues, the GSX pipeline will transport only Canadian gas to Canadian consumers. [2] Alternatively,

---

[2]In response to Whatcom County's motion to dismiss, the Commission stated:

> We share Whatcom County's expectation that Georgia Strait's proposed pipeline will serve principally to move Canadian gas to Canadian customers, i.e., to promote foreign commerce. We also share Georgia Strait's expectation—based on evidence in the record—that some lesser amount of the proposed pipeline's capacity will be given over to moving gas between states. Because NGA section 7 does not grant the Commission jurisdiction by degree, no matter how small this interstate aspect of Georgia Strait's business is when compared to the pipeline's foreign commerce transactions, this movement of gas between states subjects the entire project to our regulatory oversight under NGA section 7.

(continued...)

FSW argues that the state of Washington may properly regulate the pipeline because the pipeline is subject to the Hinshaw Amendment exception to FERC regulation.

FERC responds by arguing that, because FSW failed to challenge FERC's jurisdiction in its rehearing request before the Commission, FSW is precluded by statute from seeking review of that order in this court. FERC thus argues we lack jurisdiction to review the propriety of FERC's exercise of jurisdiction over the pipeline. FSW replies that, while it admittedly failed to raise the issue of the propriety of FERC's jurisdiction in its own petition for rehearing, Whatcom County raised that issue in its motion to dismiss, FERC addressed the matter in its

---

[2](...continued)
<u>Georgia Strait Crossing Pipeline LP</u>, 100 FERC ¶ 61,280 at 62,197. The Commission further stated:

> Our basis for asserting jurisdiction did not depend on future facilities, instead our finding was based on the proposed initial configuration of the new pipeline. This configuration includes an interconnection with the existing Northwest pipeline, at which interconnect gas in interstate commerce will be both received and delivered. As noted, it is immaterial how much gas crosses over at this interconnect. Further, it is immaterial whether gas moves across this connection physically, molecule by molecule, or moves between Georgia Strait's and Northwest's systems by displacement. The interconnect itself constitutes physical and operational integration with the existing interstate gas grid, and so renders Georgia Strait's proposed project jurisdictional under NGA section 7.

<u>Id.</u>

rejection of that motion, and the matter was therefore raised and addressed by FERC and is available for review in this court. We address first, as we must, our own jurisdiction to review FERC's orders.

Section 19(b) of the NGA provides that "[n]o objection to the order of the Commission shall be considered by the court [of appeals] unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do." 15 U.S.C. § 717r(b). "Section 19(b) reflects the policy that a party must exhaust its administrative remedies before seeking judicial review." Fed. Power Comm'n v. Colo. Interstate Gas Co., 348 U.S. 492, 499 (1955). This general rule of exhaustion, which FSW does not contest, has been consistently applied by our court and many others. As we have said, "the presentation of a ground of objection in an application for rehearing by the Commission is an indispensable prerequisite to the exercise of power of judicial review of the order on such ground." Pan Am. Petroleum Corp. v. Fed. Power Comm'n, 268 F.2d 827, 830 (10th Cir. 1959). We have further indicated that "we must apply this statute 'punctiliously' to carry out its purpose." Colorado Interstate Gas Co. v. FERC, 890 F.2d 1121, 1125 (10th Cir. 1989) (quoting New Jersey Zinc Co. v. FERC, 843 F.2d 1497, 1503 (D.C. Cir. 1988)).

We have accordingly applied that exhaustion policy to refuse to address procedural matters which were not raised in petitions for rehearing before FERC.

See, e.g. , R.R. Comm'n v. FERC , 874 F.2d 1338, 1342 (10th Cir. 1989) (refusing to consider an objection to expert witnesses because not raised in petition for rehearing before FERC); Phillips Petroleum Co. v. Fed. Power Comm'n , 556 F.2d 466, 471 (10th Cir. 1977) (refusing to consider whether a contract was renewed for purposes of obtaining a new rate because the issue was not raised in the petition for rehearing before FERC); Skelly Oil Co. v. Fed. Power Comm'n , 401 F.2d 726, 729 (10th Cir. 1968) (refusing to consider arguments by amicus because "not raised by any party on an application for rehearing as required by § 19(b) of the Act"); Pan Am. Petroleum Corp. , 268 F.2d at 829-30 (refusing to consider challenge to an order which was not challenged in a petition for rehearing).  Other courts have similarly applied § 19(b).  See, e.g. , Nat'l Comm. for the New River, Inc. v. FERC , 373 F.3d 1323, 1332 (D.C. Cir. 2004) (refusing to consider whether Commission adequately considered alternatives because not raised in petition for rehearing); Consol. Gas Supply Corp. v. FERC , 611 F.2d 951, 959 (4th Cir. 1979) (noting that "this rule [of exhaustion of administrative remedies] is particularly applicable when, as here, the objections are procedural and, if sound, subject to correction").

We have also applied the virtually identical rehearing requirement contained in the Federal Power Act to refuse to consider whether the Federal Power Commission properly determined that a petitioner had to obtain a license

-11-

for a hydroelectric power project where the petitioner failed to seek rehearing at all. Utah Power & Light Co. v. Fed. Power Comm'n, 339 F.2d 436, 438 (10th Cir. 1964). [3] We have had no occasion to apply § 19(b)'s rehearing requirement in the specific context of this case— i.e., when the issue sought to be raised before our court, but not argued on rehearing before FERC, is whether FERC properly asserted its regulatory jurisdiction over the transportation of natural gas. FSW argues it may avoid the general rule of § 19(b) in this case for two reasons: its challenge to FERC's jurisdiction is the equivalent of a challenge to FERC's subject matter jurisdiction, which can always be raised, even sua sponte by the court itself; and alternatively, Whatcom County raised the issue before FERC and FERC addressed it, so the need to have the agency address the issue first has effectively been satisfied.

**A. Subject Matter Jurisdiction**

In support of this argument, FSW relies heavily on the Eighth Circuit's decision in Union Electric Co. v. Federal Power Commission, 326 F.2d 535 (8th

---

[3]Section 313(b) of the Federal Power Act, 16 U.S.C. § 825*l*(b), contains language virtually identical to § 19(b) of Natural Gas Act. "The relevant provisions of the Federal Power Act and the Natural Gas Act 'are in all material respects substantially identical.'" Sierra Ass'n. for Env't v. FERC, 791 F.2d 1403, 1406 n.2 (9th Cir. 1986) (quoting Arkansas Louisiana Gas Co. v. Hall, 453 U.S. 571, 577 n.7 (1981) (further quotation omitted)).

Cir. 1964), rev'd on other grounds, 381 U.S. 90 (1965). As more fully explained in Judge McConnell's concurrence, the pertinent part of Union Electric is dictum and, in any event, is inapposite. Section 19(b) requires all challenges to the scope of an agency's regulatory jurisdiction to be raised first before the Commission. See Sunray Mid-Continent Oil Co. v. Fed. Power Comm'n, 364 U.S. 137, 156-57 (1960) (applying § 19(b)'s requirement that all issues submitted for judicial review must be raised before the Commission to refuse to address an argument that the Commission's order might violate the Natural Gas Act and thereby impermissibly extend its regulatory jurisdiction); Intermountain Mun. Gas Agency v. FERC, 326 F.3d 1281, 1285 (D.C. Cir. 2003) (refusing to address, because not raised in the petition for rehearing, petitioner's challenge to "FERC's interpretation of the Hinshaw Amendment to preclude exempting [from FERC regulation] a system which delivers gas that is subsequently transported temporarily out of state but returned for ultimate consumption within the state of delivery"); [4] Aquenergy Sys., Inc. v. FERC, 857 F.2d 227, 230 (4th Cir. 1988)

_____

[4]The court noted in Intermountain Municipal Gas Agency that, because the petitioner failed to raise the issue before FERC, FERC never had an opportunity to address the issue. Id. We acknowledge that FERC did, in fact, address the issue of its jurisdiction in this case, in response to Whatcom County's motion to dismiss. As we discuss more fully infra, that does not eliminate the fact that FSW, the party now challenging FERC's regulatory jurisdiction, failed to comply with the statutory requirement to seek rehearing before petitioning for review in this court.

-13-

(expressly responding to petitioner's argument that "the Commission lacks jurisdiction because operation of the project does not affect interstate commerce" and stating "[w]e decline to consider this contention because it was not presented to the Commission" and "[w]e will not consider a contention not presented to, or considered by, the Commission"). Cf. City of Farmington v. FERC, 820 F.2d 1308, 1311 n.1 (D.C. Cir. 1987) (in rejecting FERC's argument that the court lacked jurisdiction to hear petitioner's challenge to FERC's decision that petitioner's gas purchases were subject to FERC's regulatory jurisdiction, the court did *not* rely upon the rule that subject matter jurisdiction may be raised at any time).

We therefore reject FSW's argument that its challenge to FERC's decision that the GSX pipeline fell within its regulatory jurisdiction is the equivalent of a challenge to FERC's subject matter jurisdiction and accordingly not subject to the limitations of § 19(b).

### B. Whatcom County's Challenge to FERC's Jurisdiction

FSW alternatively argues that, while it did not raise the issue in its own petition for rehearing, Whatcom County raised it in its motion to dismiss GSX's application, and FERC addressed it in its denial of that motion. Most courts addressing this issue have required the party seeking review of a decision to have

sought rehearing itself before the Commission.  See Process Gas Consumers Group v. FERC, 912 F.2d 511, 514 (D.C. Cir. 1990) ("[T]he party seeking review must raise its objections in its own application for rehearing to the Commission.");  Columbia Gas Transmission Corp. v. FERC, 848 F.2d 250, 255 (D.C. Cir. 1988) (stating that a court cannot "consider an objection not raised by petitioner but argued to FERC by another party to the same proceeding");  United Gas Pipe Line Co. v. FERC, 824 F.2d 417, 434 (5th Cir. 1987) ("The plain language of section 19 requires that the very party seeking judicial review must raise its objections in its own petition for rehearing.").  We join those courts and hold that FSW cannot "bootstrap" its way into our court be relying upon the fact that another party argued the issue before the Commission.

Furthermore, even were we to permit such bootstrapping by FSW, Whatcom County was obligated by statute to seek rehearing from the Commission of its challenge to FERC's exercise of its regulatory jurisdiction.  It did not do so.  FSW may not itself fail to preserve an issue, then take advantage of the fact that another party raised the issue but failed to properly pursue it by seeking rehearing, thereby allowing the decision below to effectively become final, and seek now to escape all of those defaults.  We lack jurisdiction to consider whether FERC correctly determined that the GSX pipeline was subject to FERC regulation as an interstate pipeline.

-15-

## II.     NEPA Compliance

FSW did seek rehearing on the general issue of FERC's compliance with NEPA, asserting that FERC failed to so comply in various ways. We therefore address those arguments. We review agency action for compliance with NEPA under the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 701-06. The APA "empowers a reviewing court to hold unlawful and set aside [final] agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Lee, 354 F.3d at 1236 (further quotation omitted). This is a "deferential [standard]; administrative determinations may be set aside only for substantial procedural or substantive reasons." Id. (further quotation omitted).

NEPA delineates the process by which federal agencies "take a hard look at the environmental consequences" of a proposed agency action. Pennaco Energy, Inc. v. Dep't of Interior, 377 F.3d 1147, 1150 (10th Cir. 2004) (further quotation omitted); see Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350 (1989). Before taking "major Federal actions significantly affecting the quality of the human environment," agencies take that "hard look" at potential environmental impacts by means of an environmental impact statement ("EIS"). See 42 U.S.C. § 4332(2)(C). The EIS evaluates the environmental impact of the proposed action, as compared with the impact of alternative courses of action.

NEPA does not "impose substantive limits on agency conduct," Pennaco Energy, 377 F.3d at 1150 (further quotation omitted), "nor does it require agencies to elevate environmental concerns over other valid concerns." Lee, 354 F.3d at 1237. Accordingly, "[w]e apply a rule of reason standard (essentially an abuse of discretion standard) in deciding whether claimed deficiencies in a FEIS are merely flyspecks, or are significant enough to defeat the goals of informed decisionmaking and informed public comment." Utahns for Better Transp., 305 F.3d at 1163.

FSW argues that the FEIS in this case was deficient because it failed to adequately address four issues: reasonable alternatives; transboundary impacts; cumulative acoustic impacts; and the impact of reasonably foreseeable earthquakes.

## A.  Consideration of Alternatives

NEPA requires an FEIS to include a discussion of "alternatives to the proposed action." 42 U.S.C. § 4332(2)(C)(iii); see also 40 C.F.R. § 1502.14(a) (requiring agencies to "[r]igorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated"); Utahns for Better Transp., 305 F.3d at 1166. "The consideration of alternatives to a

-17-

proposed action is 'the heart of the environmental impact statement.'" Lee, 354

F.3d at 1238 (quoting 40 C.F.R. § 1502.14). However, the agency need not

analyze "the environmental consequences of alternatives it has in good faith

rejected as too remote, speculative, or . . . impractical or ineffective." All Indian

Pueblo Council v. United States, 975 F.2d 1437, 1444 (10th Cir. 1992) (internal

quotation marks omitted). In deciding whether an agency has adequately

considered reasonable alternatives, "courts look closely at the objectives

identified in an EIS's purpose and needs statement." Citizens' Comm. to Save

Our Canyons v. U.S. Forest Serv., 297 F.3d 1012, 1031 (10th Cir. 2002).

FSW argues FERC's discussion of reasonable alternatives was deficient in

two ways: (1) the scope of the project arbitrarily abbreviated the alternatives

analysis and (2) FERC inappropriately eliminated alternatives it had evaluated.

### 1. Scope of project

An agency may not "define [a] project so narrowly that it foreclose[s] a

reasonable consideration of alternatives." Davis v. Mineta, 302 F.3d 1104, 1119

(10th Cir. 2002). FERC described the scope or purpose of the GSX pipeline

project as "provid[ing] a transportation system for natural gas to supply the

growing demand for natural gas on Vancouver Island [and] [i]n particular . . . [to]

transport natural gas . . . to two new electric-generation facilities on Vancouver

-18-

Island." Final Envtl. Impact Statement: Georgia Strait Crossing Project at 1–1, R. Vol. III.

FSW argues that FERC's narrow definition of the project's scope—to provide natural gas as a means to meet the increased need for electricity on Vancouver Island—compelled it to ignore other ways to meet that need for electrical power. We disagree. In discussing a no-action alternative, FERC discussed various other ways to increase electrical power on the island: alternative fuels, clean-coal technology, solar power, wind-powered electricity, small-scale hydroelectric generation, and wave energy. The FEIS explained why each was not a feasible alternative.

The FEIS went on to observe that:

> [s]everal commentators on the draft EIS suggested that replacing or upgrading the underwater electric transmission cables serving Vancouver Island could reduce the near-term need for electric generation capacity on the island and should be considered as an alternative to the GSX Project. Because the direct transmission of electricity to Vancouver Island does not meet the stated objectives of the proposed project to provide a transportation system for natural gas, consideration of replacing or upgrading the transmission cable can only be considered in terms of the no-action alternative. If a project sponsor were to replace or upgrade existing cables or were to install new cables, demand for energy production on Vancouver Island could be reduced to the extent that the demand for natural gas could also be reduced. <u>Despite this fact, no such project has been proposed by potential sponsors</u>.

FEIS at 4-3, R. Vol. III. FERC also noted that "generating electricity on the mainland and replacing and upgrading its electric transmission cables would cost

-19-

about $100,000,000 (Cdn) more than building the GSX Project and generating electricity on Vancouver Island." Id. As discussed more fully below, FERC then considered a number of different natural gas pipeline alternatives.

FERC had before it a particular project proposal by a private natural gas company, involving the building of a natural gas pipeline as a means to provide electrical power on Vancouver Island. "Where the action subject to NEPA review is triggered by a proposal or application from a private party, it is appropriate for the agency to give substantial weight to the goals and objectives of that private actor." Citizens' Comm. to Save Our Canyons, 297 F.3d at 1030. FERC was not obligated to reject that project in favor of a non-natural gas alternative which was purely hypothetical and speculative. Given that the agency is only obligated to consider reasonable, non-speculative alternatives, we cannot say that its review of non-natural gas pipeline alternatives, and rejection of them in favor of the GSX project, was arbitrarily and improperly restricted by its definition of the scope and purpose of the project.

**2. Reasonable route and system alternatives**

FSW next argues FERC completely failed to consider alternative Canadian routes for the natural gas, and it failed to distinguish between alternatives that might have environmental impacts in Canada but not the United States. FSW

asserts that other agencies, namely the Environmental Protection Agency ("EPA") and the Washington State Department of Ecology ("WDOE"), shared FSW's concern that FERC's discussion of alternatives was inadequate.

The draft EIS (DEIS) identified three all-Canadian routes, two of which involved following parts of the Centra pipeline, while the third involved following an existing BC Gas Inc. pipeline for part of the route. The DEIS recommended no further consideration of these three routes because two of them presented engineering difficulties and more significant environmental impacts than the proposed GSX route. [5] The third alternative, the Sumas-Tilbury-Harmac route, was environmentally acceptable but involved severe engineering problems because it crossed through terrain that was particularly vulnerable to seismic events, even moderate ones.

Following the issuance of the DEIS, GSX-Canada commissioned a study to determine the feasibility of expanding the existing Canadian Centra and BC Gas systems to meet the objectives of the GSX project. These were considered alternative  systems , rather than alternative    routes , because they involved

_____

[5]One of the routes, the Sumas-Ioco-Comox route alternative, required the crossing of urban areas, "significantly more forestland," "several provincial parks," and "major waterbod[ies] . . . including four marine shoreline crossings and four major river crossings." Draft Environmental Impact Statement: Georgia Strait Crossing Project at 4-4, R. Vol. II. The other route, the Sumas-Ioco-Sechelt-Harmac route alternative, posed similar environmental impact concerns.

-21-

expanding existing pipeline systems, although there was some overlap with parts of the three all-Canadian routes which the DEIS had examined and recommended be removed from consideration. [6]

The FEIS describes the five pipeline system alternatives the Commission considered: "the existing Centra, BC Gas Inc. (BC Gas), ARCO, and Cascade systems as well as the previously planned Orca Natural Gas Pipeline (Orca) project." FEIS at 4-4, R. Vol. III. It concluded that: (1) expansion of the Centra system, which already was the sole provider of natural gas to Vancouver Island, was not a viable alternative because it involved "significant environmental and engineering drawbacks" including the construction of "large sections of looped pipeline through forested and mountainous terrain." FEIS at 4-5, R. Vol. III; [7] (2) the BC Gas system alternative was not viable because, although environmental concerns were a "trade off" compared to the GSX system, the geotechnical hazards associated with the BC Gas alternative were more significant; (3) the ARCO system alternative was not viable because "to provide the volumes of

---

[6]As the FEIS states, "[s]ystem alternatives differ from alternative pipeline routes (i.e., route alternatives or route variations) in that they make use of existing, modified, or planned pipeline systems to meet the stated objectives of the proposed project." FEIS at 4-4, R. Vol. III.

[7]The Commission considered two variations of the expansion of the Centra pipeline system, one of which involved the construction of a new marine crossing and one which did not. The FEIS rejected both for essentially the same reasons and noted that both alternatives also were more costly than the GSX project.

natural gas proposed by GSX-US this system would require expansion and construction of new facilities similar to or greater than those proposed for the GSX project." Id. at 4-9; (4) the Cascade system alternative was not viable because "a modification or expansion to accommodate the volumes proposed by GSX-US would not be feasible." Id.; and (5) the Orca system alternative was not feasible because it would be over 200 miles long, compared to the 84 miles of the GSX project, would have "greater onshore and offshore impacts" and had recently been "put on hold due to a lack of firm commitment from potential major customers." Id. at 4-10. Having concluded that these system alternatives, involving expansions of varying degrees of existing pipelines, were not viable alternatives, but were preferable environmentally to a completely new route alternative through Canada, the FEIS concluded that none of the Canadian alternatives was feasible.

The FEIS then examined one route alternative which passes through the United States, the Stanwood to Victoria route alternative. The FEIS concluded that, while the alternative did have some environmental advantages, those were "offset by disadvantages." Id. at 4-11. It therefore recommended no further consideration of the route. The FEIS also rejected the no action alternative, because the need for the project would not be fulfilled.

FSW argues that FERC ignored an "important distinction" between the GSX project and the system alternatives—that the GSX project will have impacts upon United States property while the Canadian system alternatives will not. FERC's discussion of the various alternatives explained why they were not reasonable viable alternatives. The fact that it selected a route with more impacts in the United States, rather than Canada, does not undermine the reasonableness of that discussion.

FSW also argues that FERC ignored concerns expressed by two other agencies—the EPA and the WDOE. The EPA submitted comments on the DEIS expressing its concern that the

> evaluation of alternatives in the draft EIS appears to have been conducted more from the perspective of developing the rational for eliminating alternatives than from the direction of the implementing regulations for [NEPA] to "rigorously explore and objectively evaluate all reasonable alternatives," and to "devote substantial treatment to each alternative considered in detail . . . so that reviewers may evaluate their comparative merits."

EPA Comments on the GSX DEIS, R. Vol. III. In response to this, FERC expanded its discussion of several of the alternatives. The EPA remained concerned about the discussion of alternatives:

> While the discussion of alternatives has been expanded in the final EIS, we remain concerned that the approach used to develop the EIS has inappropriately eliminated reasonable alternatives, in both the United States (US) and Canada, that could meet the stated purpose and need for the project. We do not believe that the EIS has

provided sufficient or compelling reasons for the elimination of alternatives presented in Chapter 4.

8/22/02 Letter from EPA to FERC, R. Vol. IV.

"[NEPA] requires agencies preparing environmental impact statements to consider and respond to the comments of other agencies, not to agree with them." Custer County Action Ass'n v. Garvey, 256 F.3d 1024, 1038 (10th Cir. 2001). On the other hand, "a reviewing court 'may properly be skeptical as to whether an EIS's conclusions have a substantial basis in fact if the responsible agency has apparently ignored the conflicting views of other agencies having pertinent expertise.'" Mineta, 302 F.3d at 1123.

FERC noted in its Certificate Order granting GSX its CPCNs that the "EPA does not challenge the need for the proposed pipeline, but prefers that this need be met by expanding an existing system." Georgia Strait Crossing Pipeline LP, 100 F.E.R.C. ¶ 61,280, at 62,198. FERC clearly considered and responded to EPA's comments on the DEIS and to its comments on the FEIS. As we have stated many times, NEPA does not require any particular substantive result, just adherence to the process by which agencies take their requisite "hard look."

FERC is obligated to "articulate 'a rational connection between the facts found and the choice made.'" Friends of Marolt Park v. U.S. Dep't of Transp., 382 F.3d 1088, 1096 (10th Cir. 2004) (quoting Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc., 462 U.S. 87, 105 (1983)). Given our deferential

standard of review, we conclude that the FEIS adequately considered alternatives and was not arbitrary or capricious in its selection of the GSX project.

## B. Transboundary Effects

NEPA's requirement that an FEIS analyze "the environmental impact of [a] proposed action," 42 U.S.C. § 4332(2)(C)(i), includes an analysis of direct, indirect, and cumulative effects. 40 C.F.R. § 1508.8. FSW argues that the FEIS failed to adequately examine the transboundary effects of the GSX pipeline project: "[t]hough FERC's final EIS contains a section entitled "Canadian Impacts," FERC's analysis in that section does not satisfy either NEPA or CEQ's guidance." Pet'r's Opening Br. at 41. FSW failed to challenge the alleged failure to consider transboundary effects in its rehearing request. Accordingly, it is barred by § 19(b) from raising that issue before us. See Colo. Interstate Gas Co., 348 U.S. at 496-97 (refusing to consider an issue not raised in petitioner's request for rehearing before the Commission); Pan Am. Petroleum Corp., 268 F.2d at 830 (noting that "[t]he presentation of a ground of objection in an application for rehearing by the Commission is an indispensable prerequisite to the exercise of power of judicial review of the order *on such ground*" (emphasis added)).

### C. Acoustic Effects

FSW argues that the FEIS failed to take a "hard look" at the project's acoustic effects. More specifically, FSW argues that FERC (1) failed to consider the acoustic effects of pipeline repair and maintenance; (2) failed to assess adequately acoustic effects before resources were committed to the project; and (3) failed to consider cumulative acoustic effects.

### 1. Acoustic effects of repair and maintenance

FERC considered the direct and indirect impacts of noise caused by the construction and operation of the pipeline on marine wildlife, marine fish, marine invertebrates and certain endangered species. It concluded that, to the extent information was available about the effects of noise on marine life, any increased noise would be temporary and/or unlikely to cause significant adverse effects. [8]

---

[8] The FEIS first observed that there is a certain amount of ambient noise present in the marine environment. It then noted that "[u]nderwater noises may potentially affect marine mammals in several ways. Pulsed or continuous noise may interfere with acoustic communication and detection . . . . Sharp pulsed or unpleasant sounds may alter normal behavior or produce a startle response. Pulsed or continuous noise may also damage auditory function leading to temporary or permanent hearing loss." FEIS at 3-58, R. Vol. III. More specifically, the FEIS stated that "[n]oise associated with the construction phase of the project would include temporary increases in vessel traffic, ship operations, and construction noise during dredging and trenching operations." Id. FERC noted that "[s]ome research has concluded that marine mammals seem to habituate to moderately noisy environments or to constant or predictable noises."

(continued...)

Id.  It then concluded that, while any construction noise was expected to be well below the level which can cause permanent damage, detailed studies on individual species of marine mammals had not been done to determine the temporary or permanent effect of increased noise levels.  However, dredging or trenching could cause some marine mammals to avoid the area.

With respect to operational noise, FERC stated that the proposed pipeline was expected to produce low-frequency, low-energy sounds, which could travel long distances, but would be at intensity levels less than those generated by vessels and general wave turbulence.  One expert predicted that "typical commercial vessels that are within three miles of the pipeline would mask any sounds emitted from the pipeline."  Id. at 3-59.  FERC concluded that the only marine mammals likely to hear noise emitted from the pipeline were baleen whales who travel "occasionally" through the area.  Id.  FERC further noted that "[t]he effect of a general increase in low frequency noise levels on the various marine mammals that live in the Strait of Georgia is unknown."  Id.  However, it concluded that "[g]iven the expected sound levels that would be emitted from the proposed pipeline and our current understanding of marine mammal sensitivity to noise, we do not anticipate that operation of the pipeline would adversely affect marine mammals."  Id.

With respect to marine fish, the FEIS stated that "[n]oise and physical disturbance of fish habitats during construction may cause avoidance or abandonment of the construction area during active construction and for some time after construction is completed.  However, it is not expected that such disturbances would be substantial or long lasting."  Id. at 3-69–3-70.  The FEIS further stated that the acoustic effects caused by the pipeline's operation were to some degree unknown, but, based upon information FERC did have, including data gathered from an existing natural gas transmission line in the Strait of Georgia, were expected to be "negligible to low."  Id. at 3-73.

Finally, FERC considered the effects of construction and operation-related noise on marine invertebrates.  The FEIS found that "[n]oise or vibrations associated with dredging and other construction activities may result in startle responses or avoidance of the area [intertidal to nearshore waters] by mobile invertebrates."  Id. at 3-83.  The FEIS found little information on the effects of pipeline operation noise on offshore water marine invertebrates, although it cited two studies suggesting little effect.  It concluded, however, from visual surveys of underwater gas pipelines that "[t]he colonization of existing pipelines with

(continued...)

Nonetheless, FERC recommended that GSX develop a plan for monitoring noise emitted by the pipeline, submit the plan for approval by the Office of Energy Projects, and then report the findings. FSW does not challenge the adequacy of FERC's analysis of the acoustic effects of the construction and operation of the GSX project.

FSW does allege, however, that the FEIS failed to consider the impact of noise caused by repair and maintenance of the pipeline, to the extent that the maintenance differs from the operation of the pipeline. FERC acknowledged that pipeline repairs are foreseeable: "Even with proper installation, operation, and routine maintenance of the pipeline system, repairs to the pipeline, including replacement of portions of the system, are reasonably foreseeable actions in the long term." FEIS at 2-24, R. Vol. III. However, FERC then concluded that "[b]ecause it is not possible to foresee where additional operation and maintenance activities would occur along the pipeline system, further review of the environmental impacts of those maintenance activities is beyond the scope of this EIS. Appropriate environmental review of those activities would take place under applicable rules and regulations." Id.

---

[8](...continued)
diverse invertebrate communities shows that noise or vibrations associated with pipeline operations does not appear to adversely affect invertebrate communities." Id. at 3-88.

After refusing to expand the scope of the EIS to assess in detail the environmental impact of hypothetical future maintenance actions, [9] FERC briefly addressed maintenance issues, noting that "[m]aintenance activities requiring pipeline excavation or replacement would be expected to be the same as those described for construction." FEIS at 3-73, R. Vol. III; see also id. at 3-104. FERC also noted, in response to a comment on the DEIS, that emergency repairs within a waterbody are "exceedingly rare." Id. at SA3-20. FSW charges that FERC's conclusion that emergency repairs in waterbodies are very rare, and its discussion of the acoustic impacts of pipeline maintenance, are conclusory and unsupported by evidence in the record. We disagree.

The FEIS contains a section on pipeline accident data. The data show that pipelines are vulnerable to failure as a result of "outside forces" such as heavy equipment, earth movement, geologic hazards, and weather effects, all less likely to damage an underwater pipeline, as opposed to an underground pipeline. Pipelines are also vulnerable to corrosion, construction and material-related

---

[9] 40 C.F.R. § 1508.25 explains the scope of an EIS. Agencies must address both actions and impacts or effects. Actions may be connected, similar, or cumulative. Impacts may be direct, indirect, or cumulative. No one argues that FERC should have addressed the environmental consequences of any other proposed action (i.e., the Gateway Pacific Terminal or the OPALCO pipeline project discussed infra) in the FEIS, only that the FEIS failed to address adequately as cumulative impacts the impacts of repair and maintenance of the pipeline.

defects, and "other" causes of rupture or damage. Because GSX is a subsidiary of the Williams Companies, FERC examined the pipeline safety record of the many miles of pipeline operated by Williams and its subsidiaries. It found that since 1991, Williams Northwest Pipeline 3900-mile-long system has had two reportable leaks and twelve reportable ruptures; the 6000-mile-long Williams Gas Pipeline-Central has had five reportable leaks and ten reportable ruptures; there have been no incidents along the 900-mile Kern River Gas Transmission pipeline; since 1995, there have been five reportable incidents along the 10,500-mile-long Transco system; and since 1995 there have been two reportable incidents along the 6000-mile-long Texas Gas system. Given that the GSX pipeline portion that is in the water is less vulnerable to many of the "outside forces" described, it was reasonable for FERC to conclude that major repairs in the marine environment, along the fourteen miles of offshore pipeline in the GSX project, would be rare.

"Even as to impacts that are sufficiently likely to occur such that they are reasonably foreseeable and merit inclusion, the FEIS need only furnish such information as appears to be reasonably necessary under the circumstances for evaluation of the project." Utahns for Better Transp., 305 F.3d at 1176. Thus, "[d]etailed analysis is required only where impacts are likely." Id. (further quotation omitted). The FEIS analysis of the likelihood of a major underwater repair was adequate, given the circumstances.

With respect to its conclusion about the acoustic effects of pipeline maintenance, FERC reached the reasonable conclusion that, while pipeline repairs and maintenance are foreseeable, it is impossible to determine now the precise impacts because it is impossible to determine now the magnitude of a future repair problem. To the extent, however, that a repair requires replacement of existing sections of pipeline, FERC reasonably assumes that the acoustic impact will be comparable to construction.

Given our deferential standard of review, we cannot say that the FEIS was deficient for failing to address further the acoustic effects of pipeline repairs and maintenance.

### 2. Cumulative acoustic effects

"An environmental impact statement must analyze not only the direct impacts of a proposed action, but also the indirect and cumulative impacts." Utahns for Better Transp., 305 F.3d at 1172 (further quotation omitted); see also 40 C.F.R. § 1508.25(a)(2). 40 C.F.R. § 1508.7 defines "cumulative impact" as follows:

> *Cumulative impact* is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonable foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

FSW argues FERC failed to analyze cumulative effects in three respects: the cumulative acoustic effect of the project in light of noise already in the marine environment; the cumulative acoustic effect of the project in light of reasonably foreseeable future projects; and the pipeline's cumulative environmental (non-acoustic) effect in the marine environment in light of past, present and reasonably foreseeable future actions.

## A.    Cumulative Acoustic Effect in Light of Background Marine Environment Noise

FSW argues "FERC failed to properly analyze the additive effect of both constant (pipeline operation) and intermittent (pipeline repair, construction, maintenance) noise sources in combination with vessel traffic and other stressors already in place in the marine environment." Pet'r's Opening Br. at 53. This is simply another way of challenging FERC's analysis of the noise impact caused by the GSX project. We have already concluded that FERC's analysis of the impact on the marine environment of the construction, operation and maintenance of the project is reasonable and not arbitrary or capricious. [10] We decline FSW's

---

[10]In its denial of FSW's rehearing request, FERC summarized its findings on the cumulative acoustic effect of routine repair and maintenance as follows: "We considered the cumulative impact of noise on marine wildlife and found that noise impacts from routine operation and maintenance activities should be temporary, infrequent, and of an intensity significantly below levels capable of

(continued...)

-33-

invitation to revisit that issue, under the guise of discussing the cumulative acoustic effect of the pipeline in the existing marine environment.

**B.    Cumulative Acoustic Effects in Light of Reasonably Foreseeable Future Projects**

Cumulative effect is defined as "the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions."  40 C.F.R. § 1508.7.  FSW claims FERC's analysis of the cumulative effects of the GSX project and other reasonably foreseeable actions in the same geographic vicinity is cursory and conclusory.

The FEIS contains a table listing "Existing or Proposed Activities Cumulatively Affecting Resources of Concern for the GSX-US Pipeline Project." Table 3.14-1, FEIS at 3-155, R. Vol. III.  It lists present activities and reasonably foreseeable future projects which may affect,      inter alia , marine resources.  The only reasonably foreseeable future projects affecting marine resources are the construction and operation of the Canadian portion of the GSX project, which would involve 27.5 miles of offshore pipeline in the Strait of Georgia; the OPALCO pipeline project, involving constructing a lateral off the GSX-US

---

[10](...continued)
causing any permanent damage."  Georgia Strait Crossing Pipeline LP, 102 F.E.R.C. ¶ 61,051, at 61,110 (2003) (footnote omitted).

pipeline and requiring eleven miles of offshore pipeline; and the Gateway Pacific Terminal, a deepwater marine terminal facility south of the BP/Amoco Cherry Point Refinery. [11] The FEIS contains the following summary of the likely cumulative acoustic impact of those projects:

> Visual and acoustic disturbances associated with pipeline construction and operation may add to other commercial, public, and recreational vessel disturbances to affect marine mammals, fish, birds, and invertebrates. The magnitude of the impact would probably be insignificant relative to the total marine environment available to, and used by, these species, particularly given the short-term nature of the construction activities.

FEIS at 3-158, R. Vol. III.

While we do not consider the cumulative acoustic impact analysis of the FEIS "to be a model of clarity or thoroughness," Custer County Action Ass'n, 256 F.3d at 1036, given our deferential standard of review, we find it sufficient. FERC reasonably concluded that the primary acoustic impact on marine resources will occur during the construction of the GSX pipeline and any other projects, should they be built. This is a limited time period. Additionally, many marine inhabitants are mobile and can avoid the area while any construction takes place. [12]

---

[11]There are other projects listed as impacting noise in the general area, but FSW's focus is on the impact of noise on marine resources, not noise in general.

[12]The FEIS acknowledges that fish, at different stages, may not be mobile. However, it concluded that the short duration of this displacement during construction rendered the environmental impact reasonable. See FEIS at 3-69–3-70.

Further, operational acoustic impacts are minimal and are generally less than those caused by vessels in the area. Any repair impacts will be intermittent and similar to construction impacts, except in the rare event that some catastrophic failure occurs.

"Our job is not to question the wisdom of the [agency's] ultimate decision or its conclusion concerning the magnitude of indirect cumulative impacts." Colo. Envtl. Coalition v. Dombeck, 185 F.3d 1162, 1176 (10th Cir. 1999). Rather, our job is to "examine the administrative record, as a whole, to determine whether the [agency] made a reasonable, good faith, objective presentation of those impacts sufficient to foster public participation and informed decision making." Id. at 1177. We conclude that FERC discharged its duty to take a "hard look" at the cumulative acoustic impacts of the GSX project along with other reasonably foreseeable projects in the same area. [13]

### C. Cumulative Non-Acoustic Environmental Effects

FSW argues the FEIS devoted insufficient attention to the cumulative non-acoustic effects of the GSX project along with the other current and reasonably

---

[13]Having determined that FERC's analysis of acoustic impacts, direct, indirect, or cumulative, was adequate, we need not address FSW's argument that FERC failed to adequately assess those effects before resources were committed to the project.

foreseeable actions and activities.  We disagree.  While the FEIS's analysis is again not a "model of . . . thoroughness," Custer County Action Ass'n, 256 F.3d at 1036, we again find, applying our deferential standard of review, that it is adequate and not arbitrary or capricious. See FEIS at 3-157–3-164, R. Vol. III.

### D.    Reasonably Foreseeable Earthquakes

Finally, FSW argues that FERC failed to evaluate the consequences of all reasonably foreseeable earthquakes, in part by relying upon an inappropriate standard, the Uniform Building Code, to identify what earthquakes are reasonably foreseeable, which, in turn, led it to fail to provide a meaningful mitigation analysis.

The FEIS states as follows concerning the standard used to design the pipeline to withstand earthquakes:  "GSX-US has designed the pipeline to withstand ground motions associated with an earthquake with a 10 percent probability of exceedance in 50 years . . . ; equivalent to a recurrence interval of 1 in 475 years.  This is common practice for buildings as summarized in the 1997 Uniform Building Codes (International Conference of Building Officials, 1998)." FEIS at 3-3, R. Vol. III.  FERC responds that GSX correctly designed the pipeline to meet current engineering design standards, as set out in three different building

-37-

guideline systems, as well as in accordance with the minimum federal standards for the transportation of natural and other gas by pipeline. 49 C.F.R. § 192.

FSW's complaint about the UBC is that it provides an inaccurate standard for identifying reasonably foreseeable earthquakes. It argues the UBC uses a standard of a ten percent chance of potential failure over the next fifty years, which, FSW asserts, is far too low a standard and fails to identify larger but still reasonably foreseeable earthquakes. Both the EPA and the State of Washington Department of Natural Resources ("WDNR") commented on the DEIS, raising a question as to whether FERC was building the pipeline to withstand all reasonably foreseeable earthquakes. [14] FERC responded to the EPA by explaining that the ten percent chance of exceedance over fifty years refers to the chance of an earthquake "capable of producing ground motions that would exceed the

---

[14]The EPA stated:

> We interpret the information presented on page 3-3 of the EIS to indicate that there is a 10% chance over the next 50 years that design standards would be exceeded by seismic motions, resulting in failure (a rupture) of the pipeline. This seems like an extraordinarily high rate of risk that cannot by addressed by simply converting the risk statement to a recurrence interval of once in 475 years. Given the proposed project's lifespan, this recurrence interval provides a misleading characterization of the project's real potential risk based on its working lifespan.

FEIS at FA 1-16, R. Vol. III. The WDNR questioned why the pipeline was not designed to withstand earthquakes having a two percent chance of exceedance. FEIS at SA 2-7, R. Vol. III.

-38-

pipeline design parameters, not the design standards. Engineering design standards typically include a safety factor that accounts for the chance that natural phenomena could exceed the design parameters." FEIS at FA 1-16, R. Vol. III.

As we have stated above, FERC was obligated to consider the views of other agencies, and in this case it did so. It was not obligated to defer to that agency's view. "We cannot displace the agencies' choice between two conflicting views, even if we would have made a different choice had the matter been before us de novo." Custer County Action Ass'n, 256 F.3d at 1036. We conclude that FERC took a hard look at seismic hazards, and its decision regarding how to address reasonably foreseeable earthquakes was reasonable. We therefore reject FSW's argument that, because the FEIS failed to analyze all reasonably foreseeable earthquakes, its mitigation analysis was inadequate.

## III.   Motion to File an Amicus Brief

Georgia Strait Crossing Concerned Citizens Coalition, a registered non-profit society in British Columbia, has filed a motion for leave to file an amicus brief. It seeks to bring to our attention events which occurred after the orders at issue in this case were issued. In particular, the Coalition argues that FERC should consider as new information the results of the Canadian environmental review of the GSX project. FERC and Intervenors Georgia Strait and Powerex

-39-

oppose the motion to file an amicus brief. FSW does not argue that we should consider the Canadian proceedings. We deny the motion.

## CONCLUSION

For the foregoing reasons, the petition for review is DENIED.

*Fuel Safe Washington v. Federal Energy Regulatory Commission*, No. 03-9577. McConnell, J., concurring.

I join the opinion of the Court, and write separately only to clarify what I understand to be this Court's holding with respect to the requirement of Section 19(b) of the NGA that "[n]o objection to the order of the Commission shall be considered by the court [of appeals] unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do." 15 U.S.C. § 717r(b). Petitioner Fuel Safe Washington has relied on dictum from *Union Electric Co. v. Federal Power Commission*, 326 F.2d 535 (8th Cir. 1964), to argue that challenges to the regulatory jurisdiction of the agency may be raised for the first time on appeal. On the contrary, there is no exception to § 19(b) for challenges to the scope of an agency's regulatory jurisdiction.

The statement in *Union Electric* on which petitioner relies ("jurisdiction over the subject matter cannot be waived by the parties by either action or lack of action"), 326 F.2d at 540, was pure dictum. *See id.* ("It, however, is not necessary for this Court to rule upon that contention . . . ."). Moreover, petitioner has not cited and I have not found any decision adopting the dictum as the holding of a court. The *Union Electric* dictum was based on an analogy to challenges to the subject matter jurisdiction of the federal courts, which cannot be

waived by the parties and can, accordingly, be raised for the first time on appeal and even *sua sponte* by any federal court. *See, e.g., Bender v. Williamsport Area School District*, 475 U.S. 534 (1986). That principle, however, is grounded in "the nature and limits of the judicial power of the United States," which is constitutional in nature, and "inflexible and without exception." *Mansfield, C. & L.M. Ry. Co. v. Swan*, 111 U.S. 379, 382 (1884). The scope of regulatory jurisdiction and of the procedural limitations on appellate challenges to regulatory agency decisions, by contrast, is a matter of policy for Congress to decide. Congress has stated in no uncertain terms that "[n]o objection" to a FERC order "shall be considered by the court [of appeals]" unless the petitioner has raised the objection before the Commission in a petition for rehearing or has reasonable grounds for failure to do so. 15 U.S.C. § 717r(b). Congress had not exempted challenges to regulatory jurisdiction from that requirement, and we have no authority to do so.

Contrary to the *Union Electric* dictum, the authority of a federal regulatory commission is not analogous to the subject matter jurisdiction of a federal court. Often, the scope of regulatory jurisdiction depends—as here—on technical questions falling within the expertise of the agency. *See, e.g., Aquenergy Sys., Inc. v. FERC*, 857 F.2d 227, 230 (4th Cir. 1988) (FERC jurisdiction challenged on the ground that the operation did not affect interstate commerce; court declined to

consider the issue on the ground that it was not presented to the Commission). Such questions must be presented to the agency so that the agency can develop the record, make appropriate findings, and apply its expertise to the jurisdictional issue. For an appellate court to make such determinations without the benefit of the agency's expert opinion would usurp the agency's proper role. If we were to adopt the *Union Electric* dictum, parties before FERC could hold their cards close to their vest and spring a challenge to the Commission's regulatory authority at the Court of Appeals level, in hopes of a different (and perhaps less well-informed) outcome. That is what § 19(b) is designed to prevent.